UNITED STATES of America, Plaintiff-Appellee,

v.

CONSOLIDATED PACKAGING CORPORATION, Defendant-Appellant.

No. 77–1422.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1977.

Decided April 13, 1978.

Donald Page Moore, Chicago, Ill., for defendant-appellant.

Ron M. Landsman, Atty., Dept. of Justice, Washington, D. C., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and WOOD, Circuit Judges, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

The one count indictment charged a fourteen-year, nationwide, industry-wide, price-fixing conspiracy by twenty-three folding carton companies and fifty of their executives in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[1] It was alleged that beginning about 1960 and continuing into 1974 the defendants and unindicted co-conspirators engaged in a conspiracy in restraint of interstate commerce to fix, raise, maintain, and stabilize the price of folding cartons[2] in

---

* The Honorable Robert A. Grant, United States Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. At the conclusion of the trial the government advised the court that this case involved the greatest number of defendants of any case in history which had ever been tried to a conclusion.

2. Folding cartons are made of paperboard in a variety of sizes and styles according to the needs of the customer, usually a manufacturer. The cartons are shipped flat from the producer to the customer to be assembled for the pack-

accordance with an understanding and concert of action among themselves. Seventy defendants pleaded *nolo contendere* and were sentenced. Only three defendants went to trial, Consolidated Packaging Corporation and two individual defendants, Melvin E. Riecke, Vice-President of Consolidated, and Vernon A. Kepford, not associated with Consolidated. In a jury trial, Consolidated was found guilty and the two individual defendants were acquitted. Consolidated was fined $45,000.[3]

On appeal Consolidated raises issues which may be broadly categorized as conspiracy issues and trial issues. The conspiracy issues raise the questions of whether or not the government by sufficient independent evidence, admissible against Consolidated, proved the existence of the national conspiracy, and whether Consolidated knowingly participated in it. Since the evidence clearly disclosed some illegal price manipulation activities by Consolidated, the related question is whether or not those activities were only isolated acts of wrongdoing. If those activities, with which Consolidated was not separately charged, were not part of the alleged national conspiracy, a variance would result. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The trial issues raise questions concerning the production of Jencks Act material under 18 U.S.C. § 3500, restrictions on cross-examination, the invoking of the Fifth Amendment by a government witness during cross-examination, lack of documentary proof of pricing, instructions, alleged prosecutorial misconduct and the amount of the fine imposed. We affirm.

### Conspiracy Issues

▮ That a broad-based conspiracy in the folding carton industry is shown by the evidence, and in effect admitted by seventy other defendants, there is no doubt. The question remains, however, of whether or not the conspiracy was proven to exist by sufficient evidence admissible as to Consolidated, and if so, did the evidence demonstrate that Consolidated knowingly participated in the particular conspiracy. The government's evidence specifically relating to Consolidated consisted of the testimony of two former Consolidated employees, Donald Anderson and Robert Dieffenbach, and three employees of competitors who testified as to particular episodes of pricing and bidding arrangements with Consolidated. To show the nationwide scope of the alleged conspiracy, of which the government claimed Consolidated's pricing activities were a part, the government relied on the testimony of four present and former employees of folding carton manufacturers and numerous memoranda prepared by Roman Hencel, a former employee of co-defendant Weyerhaeuser Company. These memoranda, made at or about the time, detail numerous price-fixing conversations with other defendants made during and in furtherance of the conspiracy, but none held by Hencel personally with Consolidated, although two contacts were mentioned.

As a part of the broad, general picture the evidence showed much more extensive involvement by other defendants than by Consolidated. Suggesting the acceptability and scope of the illegal practice in the industry, it was shown that at least four defendants, not including Consolidated, had certain employees assigned the principal responsibility of exchanging price information with "competitors" in advance of bidding. There was nothing complex about the manipulations. Carton manufacturers sold their products supposedly by competitive bidding, to a large extent on an order-by-order basis, fixed term requirement contracts, or on continuing basis contracts.[4] If

---

aging and shipping of a wide variety of products.

**3.** Consolidated is a Chicago-based folding carton producer. Its activities were scrutinized in this case particularly between 1970 and 1973. In 1973 it appears Consolidated accounted for

only 1.56% of the aggregate folding carton sales of the twenty-three defendant corporations.

**4.** A continuing basis contract is an arrangement by which a carton supplier continues to enjoy his customers' business as long as the

under this latter type of contract the present supplier might desire to effect a price raise to a particular customer without running the risk of losing the business to a competitor, the supplier would in advance exchange price information with probable competitors to secure their cooperation so that the contemplated price raise might be safely accomplished. Whenever a customer asked for competitive bids on a new requirement, the competition would at times be eliminated by the co-conspirators either refraining from bidding or by submitting intentionally high bids after secret exchange of price information so as to give the thwarted competitive bidding process the gloss of legitimacy. In some circumstances a supplier might desire to approach a new potential customer. The supplier first would contact the present supplier and exchange price information to insure that the new bidder would not undercut the price of the other. Though competition was not permitted as to price, it was at least as to quality and service. Suppliers in the conspiracy were expected to accommodate each other. Those arrangements were often accomplished by use of the telephone. Conspirators had their own helpful jargon. Those conspirators who were mutually cooperative during any particular period were referred to as being "on the phone," and those who were not conspirators, or were at least not active for a particular period were referred to as "off the phone." It does not appear that a conspirator needed to approach each new bid-letting occasion in search of some dishonest accommodation with the great care or caution which might reasonably be anticipated in an isolated instance of soliciting illegal cooperation with a competitor. The rules of the nefarious economic game appear to have been recognized and accepted. There were benefits and at times burdens. The conspirators were, however, not without all honor. If a conspirator misused the price information to underbid, he would be chastised or ostracized and taken "off the phone." This illegitimate business practice appears to have

flourished among so many of the conspirators for so long that it could reasonably be considered the customary way of doing business. All the facts and circumstances fully justify the view that a custom-made conspiratorial understanding had been developed and fashioned in a size and style most suited to their particular needs. Whenever the needs of any conspirator might require it, the conspirator had only to plug into the system, get "on the phone," and make the necessary arrangements. This system which developed and remained viable among them to be available for use by any conspirator was a pervasive aspect of the conspiracy. The many minor individual or particular conspiracies which the system fostered and spawned were evidence of the effectiveness of the general conspiracy. The conspiracy was in the nature of an industry utility, operated totally for the benefit of its shareholders, the carton producing conspirators, and to the detriment of its customers and the public. Was it shown by admissible evidence that Consolidated was for a time a shareholder in that system, although only a minor one? In our view it was. We must examine the conspiracy evidence in relation to Consolidated in specific detail.

Consolidated aptly refers to the various times when Consolidated appears in particular price discussions as episodes, although we do not view them as isolated unrelated events in the context of this case. We believe it is necessary to review and comment on all those episodes, each one of which is a distinctive occurrence yet each serves in some way to illustrate Consolidated's participation in the continuing system of the overall general conspiracy. Except for our interpretation of the significance of the episodes, after reviewing the transcripts we have generally accepted the evidence as it was set forth in Consolidated's comprehensive brief.

The first episode concerns the major account of A–C Spark Plug Division of General Motors. In 1970 Diamond Interna-

supplier's prices do not get too far out of price line with the competitors and the supplier con-

tinues to otherwise satisfactorily service the account.

tional Corporation and Weyerhaeuser, who were sharing the A–C account with Consolidated, decided to increase their prices to A–C at the next bidding for a yearly contract. Consolidated received a call from an officer of Diamond and responded by sending the manager of one of its carton plants to a motel meeting between representatives of the three suppliers. At the meeting Consolidated was advised about the price increase desired by the other two suppliers and then agreed to likewise raise Consolidated's prices. However, Consolidated subsequently reneged and as a result increased its share of the A–C account by underbidding Diamond and Weyerhaeuser. Diamond complained about the violation of the motel agreement to Consolidated's Vice-President Riecke. Riecke alibied to Diamond that he had been unable to control Consolidated's manager who had attended the meeting and who had entered into the violated agreement. Consolidated stresses on appeal that Consolidated in the final analysis in effect "refused" to raise its prices and prevailed in the price competition. We believe that Consolidated mischaracterizes that episode. Regardless of how the bidding went or whether the agreement was kept or not, this episode from and after the time of the agreement was a conspiracy by itself, but beyond that, the circumstances suggest that this minor conspiracy was made possible by, and became a manifestation of, the larger overall conspiracy. The transcript reveals the ease with which this illegal agreement was entered into. A phone call was made and the meeting was held and agreement reached to honor the increased bidding. Weyerhaeuser, a major conspirator and participant was "on the phone." No one appears to have hesitated, questioned or approached the meeting with any display of the caution that might be expected when first entering into such an illegal enterprise with competitors. It becomes apparent that the custom of the trade, the overall conspiracy, was well-known by 1970 and available for use whenever and to the extent it might help fulfill the needs of any subgroup of conspirators.

The second episode which also concerned the A–C account occurred the latter part of 1972. International Paper Company was preparing a bid for the 1973 A–C contract, as was Consolidated. Two International officers called and talked to two officers of one of Consolidated's plants, Robert Dieffenbach and Donald Anderson, general manager and sales manager, respectively. Dieffenbach and Anderson had been advised by Vice-President Riecke to expect the call from International. Their respective prices were discussed, but no specific agreement appears to have been reached. International subsequently underbid Consolidated and acquired the business. Upon learning of this development, Riecke became "upset." A meeting was arranged with International, to which Riecke took Dieffenbach and Anderson. Riecke accused the International officers of having "broken a faith" by misusing the information and undercutting Consolidated's prices. Riecke concluded by saying he would "get even" and "never again trust International." International's head of its folding carton division, Wilbert Cox, agreed that since the price conversation had taken place, International should have respected it. Even though there may have been no express price agreement, it was conceded that the rules had been broken. The overall conspiracy system in this instance had been misused and a complaint lodged.

The third episode involves conversations between officials of Container Corporation of America and Consolidated about bidding on annual contracts to supply cartons to the Kool-Aid division of General Foods Corporation. Some time during 1972–73, an official of Container called Anderson at Consolidated to express concern that Consolidated would bid too low considering the nature of the Kool-Aid business. Anderson advised that Consolidated did not have the same concern, but nevertheless would "be willing to discuss anything with them. . . ." Later Riecke advised Anderson that they would meet with Container, but revealed that since he already knew what Container's prices were to be, Consolidated would

not need to disclose its prices. The meeting was held, but specific prices were not discussed. The emphasis was on costs. Consolidated stresses that as a result of that meeting, Container didn't change its prices, and Consolidated made no commitments, arrived at no price agreement, and did not agree to advise Container of Consolidated's final bid. We view this episode, however, not in isolation, but in relation to the other events. The fact that this effort to use the conspiratorial system was not productive, possibly because Riecke already had the price information which otherwise might have been sought, does not detract from the episode's value as evidence manifesting the existence of the conspiracy system designed to facilitate such mutual efforts.

The next limited episode involves only conversations some time during that same period between William A. Gensler, sales manager of Container, and Anderson of Consolidated concerning the accounts of two buyers of cartons, Solo Cup and Jockey Shorts. In one conversation, Gensler discussed "price levels" regarding Solo Cup and in other numerous conversations with Anderson discussed the "level of business" of the Jockey Shorts business. There was no evidence that either Solo Cup or Jockey Shorts was a customer of Consolidated. Gensler also mentioned he had become acquainted with Riecke, Vice-President of Consolidated, at trade association dinners and other meetings. He also defined "cover bid" a term used in the industry, to mean that there would be no price cutting. By themselves these conversations are not significant, but considered with the rest of the evidence they suggest an awareness of the practices of the conspiracy.

The fifth episode pictures Consolidated as the moving party. In late 1972 or early 1973, Anderson received a bid solicitation from Quaker Oats for a large share of its folding carton needs. Before submitting any bid, Anderson called Bob Ryan, a counterpart at Michigan Carton Company. Anderson inquired, since he was aware that Michigan Carton was a prime supplier for Quaker Oats, if Ryan desired Anderson to clear any pricing with him before Consoli-

dated submitted its bids to Quaker Oats. Ryan said he would appreciate it, and subsequently Anderson complied. Anderson again called Ryan and advised that Consolidated would bid only on certain items and gave Ryan the prices Consolidated would be quoting. Ryan had no objection. Consolidated attempts to minimize this episode by pointing out that Consolidated did in fact underbid Michigan Carton and that Consolidated did not in this instance contact other carton bidders. Nevertheless, this episode illustrates Consolidated's minimum compliance with the "on the phone" conspiracy rules by clearing prices with the major supplier of the particular account.

Just before it came time to bid on the annual contract for the Gaines carton business in early 1973, Anderson called Jim Dickert at Hoerner-Waldorf, a competitor, who had also been supplying some of Gaines' carton needs. Anderson advised Dickert that Consolidated "would be interested in exchanging information with them so that we didn't upset their pricing and they didn't upset our pricing." That suggestion was agreeable with Dickert who suggested that Anderson call again to exchange prices when the prices were determined. Later Anderson again called Dickert to advise that Consolidated would be bidding on some of the business Hoerner-Waldorf had previously held and what Consolidated's bid would be. Dickert said there was no objection to the pricing Consolidated would be using. In regard to this same account during this same period, Anderson also called Ryan at Michigan Carton. Anderson informed Ryan that Consolidated would be "looking very closely" at the particular items then being supplied by Michigan Carton since Consolidated desired to expand the carton business it was also doing with Gaines, a part of General Foods. However, Anderson advised Ryan that Consolidated would protect the pricing of Michigan Carton, but would "ride very close to it." Ryan responded that he understood and would respect it so long as Consolidated stayed above the pricing of Michigan Carton. Other bidders were involved, but were

not contacted by Anderson. Consolidated was the successful bidder on some of the Gaines business. We do not deem it significant in the context of this case that Consolidated did not contact all the other possible bidders or was not the successful bidder on a particular item in which Consolidated was interested. Again, this sixth episode is evidence of the way that the industry on a wide scale, and Consolidated in particular, manipulated the bidding that was of concern to them at the moment.

The next episode consists of phone calls during this 1972–73 period made by Anderson to Mr. Lencioni at Champion Paperboard and also to Harry Kerchner at Hoerner-Waldorf concerning the Miami Margarine account. Consolidated was supplying this account on a "continuing basis," and could reasonably expect to continue to do so provided its quality or pricing did not lose favor with the customer. Anderson advised Lencioni by telephone that Consolidated was planning to increase its carton prices to Miami Margarine in line with recent paperboard increase and requested Lencioni's support in the event Champion Paperboard might be called upon to submit a bid by Miami Margarine in view of Consolidated's proposed increase. Lencioni agreed. Subsequently Anderson advised Lencioni specifically of the price increase contemplated by Consolidated. Lencioni replied that Champion Paperboard would support the increase. An extra call to Lencioni by Anderson was considered necessary because after Consolidated submitted its increased price, Miami Margarine objected. Anderson advised Lencioni of that adverse development and of Consolidated's intention to remain firm in the increase. Anderson expressed the "hope that we would get support in the industry for the increase." Lencioni agreed to continue to support the increase. Similar successful conversations took place during this same time about this account with Kerchner at Hoernoer-Waldorf. We see no significance in the context of this case that as it turned out neither Champion Paperboard nor Hoerner-Waldorf was called upon by Miami Margarine to submit bids. Miami Margarine had a continuing basis arrange-

ment with Consolidated. Anderson was only taking out price rise insurance for Consolidated with a selected segment of the general conspiracy industry network in the event the reaction of Miami Margarine to Consolidated's increase was so serious as to cause the bidding to be opened to other suppliers.

The next episode, the eighth, consists only of a conversation in late 1972 between Anderson and Dieffenbach, general manager of Consolidated's plant, about Consolidated's bid on the Salerno-Megowen account. Dieffenbach asked Anderson to withdraw Consolidated's bid because Anderson had failed to make any advance contact or discuss pricing with International Paper, a competitor for the account. Dieffenbach advised Anderson he was supposed to have made that contact. Contrary to what Consolidated argues, we do not deem it significant that the evidence does not show whether the bid was withdrawn or not. The conversation does serve to give a little more insight into Consolidated's internal operations in keeping with the rules of the general conspiracy.

One other, the last episode, deserves attention. This involves Consolidated's bids on four different occasions during 1973 on the Tootsie Toy order-by-order business of the customer, Strombecker, Inc. Prior to the first bid Anderson determined from an identifying logo on the cartons in use by Tootsie Toy that the cartons currently being used were supplied by Crane Carton Company. However, no contact was made by Consolidated with a competitor prior to submitting Consolidated's bid. Even though Consolidated's bid was based on a higher than usual profit margin, Consolidated was the successful bidder. Contrary to what might be reasonably expected with this success, Anderson's superior, Riecke, was not pleased with the new business. Riecke wanted to know why Anderson had not made pricing contacts with Crane Carton. Crane Carton happened also to be a customer of Consolidated. Riecke advised Anderson that this failure had caused trouble and wanted to know whether or not

Consolidated's bid could be withdrawn. It was too late for that. Riecke directed Anderson, however, on future Tootsie Toy bids to "clear any prices." At the next chance for Consolidated to bid on Tootsie Toy, Anderson had several conversations with the president of Crane Carton. In the first conversation, Anderson advised Crane Carton of the price Consolidated intended to bid on the item. The response of Crane Carton's president was that Consolidated's price was too low. Another phone call followed in which Crane Carton gave Anderson the price that Consolidated should use in its bid. That price was used by Consolidated, but obviously it did not secure the business. The third bid followed later on the same account. This time Anderson again attempted to contact Crane Carton as he had been instructed to do by Riecke, but for some reason failed to talk to anyone at that company. This time Consolidated without a bid dictated by Crane Carton was again successful and got the business, but again Anderson was in trouble. Jim Switzer, successor general manager of Consolidated's plant following Dieffenbach, relieved Anderson of handling the pricing of the Tootsie Toy account for the future, and directed Anderson on the occasion of the fourth bid to bring to him the cost sheets used at arriving at the price. Switzer, along with Anderson, then had a phone conversation with Crane Carton. After a price discussion, Switzer told Anderson the price to be bid by Consolidated and that "he (Switzer) would see to it that it was used." Consolidated again failed to get the business. We do not believe, as Consolidated argues, that this episode is to be minimized because Anderson's testimony was uncorroborated. Consolidated also suggests that since Crane Carton was Consolidated's customer and because the evidence does not reveal information about Crane Carton's bids, this episode is not deserving of attention. Nevertheless, we view the episode as a revealing insight into how a small part of the overall conspiracy functioned, although imperfectly at times.

On other occasions, Anderson recalled discussing the pricing of another account with Champion, with someone else about the Kroger account, and with another person at International about the Colgate-Palmolive account.

In our opinion those episodes show that Consolidated, although not one of the major conspirators, was nevertheless engaged in a conspiracy with those who should have been Consolidated's competitors. The size and form of that conspiracy begin to take more definite shape when it is considered that those with whom Consolidated engaged in price activities were themselves also similarly engaged with many others even though Consolidated was not directly involved with those others. The competitors with whom Consolidated discussed pricing and bidding were not all neighbors of Consolidated, but were located in various parts of the country. So, too, were the customers of Consolidated whose accounts were discussed with competitors. It does not require any extensive use of imagination to see why dishonest businessmen working in the national marketplace believed that the general conspiratorial system functioning throughout much of the industry could be useful whenever needed. That many of the conspirators did not know each other, had no direct contact with each other, and were not always interested in the same customers was probably as immaterial to the conspirators as it is to us now. Capping this evidence are the Hencel memoranda, recording the price-fixing activities of all but three of the indicted corporate defendants. Defendant in its brief sums up those documents, to which it strongly objects, saying, "[B]ut what the live testimony lacked, the Hencel documents supplied: dated, annotated, specific, sensational evidence of scandalously illicit conversations between Hencel and scores of others who, in turn, related to Hencel the equally shocking statements of additional scores of declarants—a total of 153 conversations."

Against that evidentiary background, we must next consider whether there was adherence to the principles of law applicable to conspiracy issues.

██ Consolidated cautions this court not to relax its application of the usual criminal rules through some mistaken belief that something less stringent is required when the offense charged involves only the marketplace business activities of a corporation. There should be no doubt that this court, as well as Congress, views price-fixing as a serious crime to be tried according to fundamental criminal standards. *United States v. Standard Oil Co.*, 316 F.2d 884, 889 (7th Cir. 1963). However, that is not to say that the law of conspiracy requires us to view the evidence in this case with naiveté. The law has some obligation to keep up with the ingenuity and subtlety of sophisticated businessmen, but it is equally true that the law of conspiracy should not be perverted into an instrument of injustice. *Dennis v. United States*, 341 U.S. 494, 572, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), (Jackson, J., concurring); *Von Moltke v. Gillies*, 332 U.S. 708, 727–28, 68 S.Ct. 316, 92 L.Ed. 309 (1928), (Frankfurter, J., concurring). If persons devise some subtle, unique form of conspiracy tailored to best serve their own purposes which purposely leaves few tracks or fingerprints, it may violate the law even though it cannot be easily accommodated in the familiar mold of a simple and limited conspiracy.

██ It is understood that the essence of conspiracy is agreement, *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954), but the formalities of the usual business contract are neither required nor expected. "No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose." *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Tacit understanding created and executed by a long course of conduct is enough to constitute agreement even without personal communication. *Direct Sales Co. v. United States*, 319 U.S. 703, 714, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). *United States v. Robinson*, 470 F.2d 121, 123 (7th Cir. 1972). In this record we cannot find the specific agreement, its

embryo or history of its development. The conspiracy seems to have been discovered full-grown, although complex conspiracies are seldom born in that condition. Usually they develop and mature by successive stages. *Blumenthal v. United States*, 332 U.S. 539, 556, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The form or manner of making the agreement are not crucial. The government by the testimony of its witnesses, including some of Consolidated's own former employees, established directly and circumstantially a *prima facie* case that there existed a wide price-fixing conspiracy of some size and form although it was largely undefined and its dimensions may not have been fully realized by Consolidated. As was stated in *Direct Sales Co. v. United States*, 319 U.S. at 714, 63 S.Ct. at 1270, "The proof, by the very nature of the crime, must be circumstantial and therefore inferential to an extent varying with the conditions under which the crime may be committed. But this does not mean that the evidence may be equivocal . . .." The evidence here is sufficient "to meet the threshold requirement of showing the likelihood of an association" between the conspirators, including Consolidated. *United States v. Borelli*, 336 F.2d 376, 387 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555. That same testimony also put Consolidated, not deep into the conspiracy, but at least into its outer crust. Once the conspiracy has been established, slight evidence is needed to connect a particular participant. *United States v. Braasch*, 505 F.2d 139, 148 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775, *United States v. Robinson*, 470 F.2d 121, 123 (7th Cir. 1972). Even a single act may be sufficient to draw a defendant within the ambit of a conspiracy where the act is such that one may infer from it an intent to participate in the unlawful enterprise. *United States v. Cardi*, 478 F.2d 1362, 1369 (7th Cir. 1973), *cert. denied,* 414 U.S. 852, 94 S.Ct. 147, 38 L.Ed.2d 101. "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from

a 'development and a collocation of circumstances.'" *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The episodes we have reviewed supply the necessary minimum of evidence. *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078 at 1086–87 (5th Cir., decided February 28, 1978).

▇ Consolidated also reminds us that guilt, even in a conspiracy, remains individual and is not a matter of mass application. *Kotteakos v. United States*, 328 U.S. 750, 772, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). But the *Kotteakos* Court also recognized that "when many conspire, they invite mass trial by their conduct." *Id.* at 773, 66 S.Ct. at 1252. As only Consolidated and two other individual defendants went to trial, it was not a mass trial in the usual sense even though much of the evidence directly related only to other conspirators. The evidence not directly involving Consolidated, it argues, was not only irrelevant but prejudicial. The evidence does not show Consolidated to have been a major conspirator, but neither does it show Consolidated to have been a major producer of cartons. Considering the size of Consolidated and the nature of the conspiracy, we deem it irrelevant that Consolidated did not know all the other conspirators, or have knowledge of all the transactions in which it had no immediate interest. It is well understood that a conspirator need not know all the other conspirators, nor have direct contact with them. *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir. 1972), *cert. denied*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581; *United States v. Braverman*, 522 F.2d 218, 222 (7th Cir. 1975), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302. In *Blumenthal*, 332 U.S. at 556–57, 68 S.Ct. at 256, the Court explains:

> [I]t is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.

Because of the nature of this conspiracy, it could not reasonably be expected that any one conspirator would have full knowledge. Consolidated did not need full knowledge to participate in the benefits of the conspiracy and therefore proof that Consolidated was fully informed was not required. The inference is strong that the conspirators, including Consolidated, had some knowledge that activities of the same type as practiced by them for the same mutual purposes must have been widespread in the industry. It is evident from the testimony of Consolidated's own former employees that Consolidated had knowingly joined something bigger than it was. We believe it may reasonably be inferred from the evidence that the overall design, purpose and functioning of the conspiracy were within the reasonable contemplation of Consolidated when it engaged in the episodes. *United States v. U. S. Gypsum Co.*, 550 F.2d 115, 127 (3rd Cir. 1977), *cert. granted*, 434 U.S. 815, 98 S.Ct. 52, 54 L.Ed.2d 71. Consolidated endeavored to abide by and assist in the enforcement of the rules of the conspiracy. By its behavior, Consolidated demonstrated it knew enough about the conspiracy to use it to serve its own purposes when needed. There is more than suspicion; there was interested cooperation with a stake in the venture. *Direct Sales Co. v. United States*, 319 U.S. at 713, 63 S.Ct. 1265. Consolidated was "on the phone."

The Hencel memoranda, which except for the *prima facie* showing of conspiracy would have been hearsay as to Consolidated, were significant in filling out the full shape and form of the broad conspiracy. Those memoranda explicitly record notes of many specific conversations by Hencel, Weyerhaeuser's price-fixer, with twenty of the defendants and others made during and in furtherance of the industry conspiracy. Consolidated was mentioned only twice in the memoranda, the balance being about particular price activities of conspirators not shown to be within Consolidated's specific knowledge. The only significant mention of Consolidated is in relation to episode one. On that occasion, Weyerhaeuser's representative, together with a representative of Diamond and Consolidated, agreed to a price increase for their bids. The Diamond representative who attended the meeting also testified about this episode. The Hencel memoranda and the testimony of the Diamond representative correspond. Once the *prima facie* case of the conspiracy had been established by proof *aliunde*, the hearsay evidence of the Hencel memoranda became admissible to more clearly illuminate the conspiracy's internal workings and extent. *United States v. Nixon*, 418 U.S. 683, 701, n. 14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Rizzo*, 418 F.2d 71, 82 (7th Cir. 1969); *Oltman v. Miller*, 407 F.2d 376, 378 (7th Cir. 1969). We need not decide in this case if the admissibility of the Hencel memoranda, depending upon independent evidence to overcome its hearsay disability, was affected by Rule 104(a) of the Federal Rules of Evidence.

In the evidence a pattern can be discerned in the similar activities of the conspirators. The intent of all to make more profit by price manipulation than could be anticipated from legitimate bidding exudes from the evidence. That could be accomplished by simply cooperating together in the industry to manipulate the prices. Consolidated correctly argues that the mere exchange of price information is not itself a *per se* violation of the Sherman Act. Some exchanges may qualify as legitimate. *United States v. U. S. Gypsum Co.*, 550 F.2d at 123. However, in the context of the present case we do not view the price exchange motivation as legitimate. That the evidence did not contain full documentation of all the bids and prices involved, as would be expected on a civil suit arising out of a contract growing out of a particular bid, we deem to be immaterial. If the conspirators could make the conspiracy work and minimize price competition, all conspirators could expect a more profitable survival due to the artificially established higher prices. That to accomplish this, there were spawned numerous other lesser conspiracies related to specific bids does not create a variance. *Kotteakos v. United States*, 328 U.S. at 750, 66 S.Ct. 1239. The indictment charges only the industry-wide conspiracy. That was established. The government might also have proceeded piecemeal with numerous indictments against each conspirator alleging the lesser conspiracies. That was not necessary. *United States v. Bastone*, 526 F.2d 971, 980 (7th Cir. 1976), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797; *Koolish v. United States*, 340 F.2d 513, 522 (8th Cir. 1965).

Our task, however, is not to retry this case from the record. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Zarattini*, 552 F.2d 753 (7th Cir. 1977), *cert. denied*, 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262. After examining the record, we believe there was substantial evidence, direct and circumstantial, together with the reasonable inferences to be drawn therefrom, from which the jury could arrive at its finding of guilt beyond a reasonable doubt. *United States v. Isaacs*, 493 F.2d 1124, 1146 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146. And inconsistencies, discrepancies, and ambiguities which may have existed, along with credibility, are matters better left for resolution by the jury. The

jury was fully instructed on the issues we have been considering. One phase of the instructions will be considered in detail hereinafter.

### Trial Issues

 Anderson was a principal government witness. Consolidated complains that it was erroneously deprived of fair opportunity to discredit his testimony by three rulings. First, the court refused to order production of government counsels' memoranda of its interview with Anderson, which defendant claims is in violation of the requirements of the Jencks Act, 18 U.S.C. § 3500. During the interview, two government counsel made notes, which shortly thereafter were used by one counsel to prepare detailed memoranda. The original notes and memoranda were given to the trial judge for *in camera* inspection, then sealed and later made a part of the record on appeal. Consolidated does not argue that those materials, which it has not seen, qualify under 18 U.S.C. § 3500(e)(1), but under (2).[5] Government counsel represented the original notes to be one-word references and short phrases, not any type of recording, not a substantive verbatim recital and not done contemporaneously. Consolidated does not deny those claims, but relies on government counsel's representation that his later memoranda are accurate and made shortly after the interview as justification for their production. The statute does not require production of a statement subsequently prepared no matter how accurate it may be. *Palermo v. United States*, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *United States v. Cadillac Overall Supply Co., supra*, 568 F.2d at 1090. We also have examined the sealed memoranda and find them to be as represented by the government. The original notes, as far as they are intelligible, are

mere longhand words and phrases and fall far short of coming within the Jencks Act requirements. They cannot be characterized as "substantially verbatim" even interpreting that phrase to mean less than "precisely verbatim." *N.L.R.B. v. Safeway Steel Scaffolds Co.*, 383 F.2d 273, 278 (5th Cir. 1967), *cert. denied*, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968). Consolidated calls to our attention *Williams v. United States*, 119 U.S.App.D.C. 177, 338 F.2d 286 (1964), and *United States v. Hilbrich*, 341 F.2d 555 (7th Cir. 1965), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704 (1965), as involving similar memoranda. Both cases are easily distinguishable. In *Williams* the statements were transcribed by a grand jury clerk in typewriting during the interviews and an examination of the memoranda strongly suggested they were substantially verbatim, even adopting the witnesses' ungrammatical construction of sentences. *Hilbrich* stands for the proposition that if a statement taken or recorded by government counsel falls within the act, it must be produced even though the statement might be labeled an attorney's "work product." No claims were made that the notes of the memoranda might contain *Brady* material. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The result is not harsh as the substance of the interview was disclosed to Consolidated in the bill of particulars.

 Next, in the use of the bill of particulars to cross-examine Anderson, Consolidated developed some inconsistencies primarily in relation to dates which it considered important. A stipulation was suggested but refused by the government which countered with an offer to produce the original memoranda sought by defendant if defendant would stipulate to their accuracy. Consolidated understandably re-

---

**5.** 18 U.S.C. § 3500(e)(1) and (2) provide:

(e) The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

fused. Consolidated then considered calling government counsel as a witness to try to establish the alleged impeaching statements. Consolidated, however, decided not to follow that course when the government claimed that it would then have the reciprocal right to rehabilitate Anderson with his consistent statements. The trial judge tentatively indicated a somewhat narrower view of the government's right to rehabilitate than espoused by the government, but broader than argued by Consolidated in that it would not necessarily be strictly limited within the scope of any impeaching inconsistent statements. The trial judge stated that he viewed it as a matter of discretion and the extent consistent statements might be permitted was difficult to know but that the government would not be allowed to put in every affirmative statement it might wish. He would permit what was sufficient to show that the statement of the witness contained more than the three or four points that Consolidated desired to extract from it as impeaching. Consolidated argues that it was the government's position that if government counsel was called as a defense witness to establish Anderson's inconsistencies, the government would be able to introduce by cross-examination "all" of Anderson's prior consistent statements from the interview. Thus Consolidated says it would be prejudicial to have Anderson's "entire" testimony retold to the jury by the government attorney at the very end of trial. Consolidated refers us to *Dagley v. Armstrong Rubber Co.*, 344 F.2d 245 (7th Cir. 1965), for a summary of the law of the use of prior consistent statements. Generally that case holds that, "When impeachment of a witness is by means of statements, inconsistent with the witness's sworn testimony, the weight of

authority is that his testimony may not be corroborated by proof of his consistent statements made prior to his alleged inconsistent statements." *Dagley* also recognizes the exception embodied in Rule 801(d)(1)(B) of the Federal Rules of Evidence.[6] We agree with that general principle, but in the present case the circumstances were different. We believe that Consolidated, in deciding not to pursue its impeaching inquiry, relied upon the government's broad arguments as to what it could do in retaliation to rehabilitate its witness rather than upon the trial court's more limited preliminary expression of its view. The trial court relied on *Affronti v. United States*, 145 F.2d 3 (8th Cir. 1944), cited in *Dagley, supra*. In *Affronti*, 145 F.2d at 7, the court recognized the exception applying if the testimony is assailed as a fabrication, and the further exception "that if some portions of a statement made by a witness are used on cross-examination to impeach him, other portions of the statement which are relevant to the subject matter about which he was cross-examined may be introduced in evidence to meet the force of the impeachment." The focus of the consideration was the one interview memorandum about which the trial judge indicated preliminarily a more restrictive view than that urged by the government. The trial judge made it plain that "anything that is in the memorandum which was not testified about would be excluded and they [government] can't bring in independent statements by the witness he didn't testify about." Later when the subject arose again the trial judge stated that he thought "there is a limit to how much of the prior consistent statements should go in," and that the limit is difficult to discern since it is largely a matter of

---

**6.** The government does not claim that the exception applies, although we note that Consolidated argues here that Anderson left Consolidated in 1973 for a lesser job, "angry and resentful." Consolidated also argues that Anderson changed his version of the facts in three instances in 16 days and could not recall the prior statements and denied changing his story. Rule 801(d)(1)(B) provides:

(d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

discretion. He concluded by saying that the government would not "be allowed to put in every affirmative statement that they wish to rehabilitate the witness, but sufficient to show that he did give a considerably more lengthy statement than the four or three points that the defendants wish to impeach on and that those statements were consistent with what he testified about on the stand." It is impossible for us to determine now what might or might not have developed had Consolidated decided to proceed with its impeachment effort. We do not know what the responses of the witness would have been or how the trial judge in the exercise of his discretion would have limited the government's efforts. As we view the problem in the context of this case, Consolidated made a choice. At worst there could have been some repetition of parts of Anderson's testimony, but nothing new was to be permitted by any rehabilitative efforts of the government. Cross-examination was otherwise extensive on the inconsistencies. In final argument, counsel for Consolidated concentrated on Anderson, his bias, his anger with Consolidated, the discrepancies in his testimony, and his lack of veracity. In the context of this case, we do not view the trial judge's limited preliminarily expressed view to have been so erroneous as to constitute reversible error when Consolidated chose not to proceed to test the judge's discretion on particular items. We see no reasonable possibility that the lack of further effort to impeach on the same issues contributed to the conviction. *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The next alleged trial error also centers around Anderson. Pursuant to 18 U.S.C. §§ 6001–6003, he had been granted immunity. Before being called to testify, Consolidated caused a subpoena to be served on Anderson seeking some of his personal records, his expense accounts and income tax returns. Anderson was willing to comply provided it was clear those areas of collateral exploration were included in his immunity. The trial court declined to enforce the subpoena and subsequently An-

derson invoked his Fifth Amendment privilege against self-incrimination and refused to produce the personal records. Consolidated correctly points out that this is unlike the situation where the defendant seeks the immunization of defense witnesses as Anderson was already immunized. *United States v. Allstate Mortgage Corp.*, 507 F.2d 492 (7th Cir. 1974). It is the government's view that the subpoena could not be used just for discovery, and that there must appear some reasonable prospect that the subpoena would produce relevant admissible evidence. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Consolidated argues that Anderson did not object on the ground that the subpoena was broad or harassing, so the government could not. It is up to the trial court in its discretion to determine what is relevant to the issues in the case. The fact that a witness is immunized does not broaden the issues, or so expand relevancy as to permit a trial of the witness by defense counsel for some possible tax violation. The relevancy of the documents sought is not apparent.

The next claimed trial error is an allegation of prosecutorial misconduct during cross-examination of defense witnesses and during closing argument. We see no merit in those charges or any need to consider them in detail here.

Consolidated also claims error because of the trial court's failure to give the conspiracy instruction submitted by Consolidated. Consolidated concedes that the instruction which was given was technically correct, but complains that it failed to emphasize sufficiently certain issues the defendant desired to have highlighted. We do not believe, as defendant argues, that *United States v. U. S. Gypsum Co., supra*, requires that the instructions given in the present case be held to constitute error. The law was fairly, accurately, and completely stated to the jury.

■ Finally, Consolidated argues that the fine imposed on Consolidated, $45,000, was excessive in comparison to fines imposed by another judge on the other conspirators who had pleaded *nolo contendere* and evidences a penalty on Consolidated for going to trial. We see no merit in the contentions and no justification for disturbing the discretion of the trial judge in selecting what he considered to be an appropriate penalty in this case.

AFFIRMED.