**UNITED STATES of America, Plaintiff-Appellant,**

v.

**BEACHNER CONSTRUCTION COMPANY, INC., Defendant-Appellee.**

**No. 83–1335.**

United States Court of Appeals, Tenth Circuit.

March 22, 1984.

Andrea Limmer, Dept. of Justice, Washington, D.C. (Judy Whalley and Mary Jones, Dept. of Justice, Chicago, Ill., William F. Baxter, Asst. Atty. Gen., and John J. Powers, III, Dept. of Justice, Washington, D.C., with her on the briefs), for plaintiff-appellant.

Colvin A. Peterson, Jr., Kansas City, Mo. (Glenn E. Casebeer, II, Coffeyville, Kan.,

and Kurt L. Rasmussen, Kansas City, Mo., with him on the briefs), for defendant-appellee.

Before SETH, Chief Judge, BARRETT, Circuit Judge, and O'CONNOR *, District Judge.

BARRETT, Circuit Judge.

The United States appeals from an order of the district court, 555 F.Supp. 1273 (1983) granting the defendant-appellee Beachner Construction Co., Inc.'s (Beachner Co.) motion to dismiss an indictment on the basis of double jeopardy. On February 4, 1982, a Kansas City, Kansas, federal grand jury indicted Beachner Co. and its Secretary-Treasurer, Robert Beachner, on one count of bid-rigging in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and on one count of mail fraud in violation of 18 U.S.C. § 1341. This indictment (*Beachner I*) related to the alleged bid-rigging of a state highway construction project in Harvey County, Kansas.[1] On May 7, 1982, both defendants were acquitted following a jury trial.[2]

On November 16, 1982, a second indictment was returned against Beachner Co., naming Jerry Beachner, a Vice-President, as a codefendant. This indictment (*Beachner II*) charged the defendants with three Sherman Act violations (15 U.S.C. § 1) and three mail fraud violations (18 U.S.C. § 1341) regarding three Kansas highway construction projects let on April 25, 1978 (Bourbon and Allen Counties), November 1, 1978 (Cowley County), and July 19, 1979 (Montgomery and Neosho Counties). After both defendants moved to dismiss on double jeopardy grounds, the district court

held a pretrial evidentiary hearing as required by *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). At the close of this hearing, the district court granted Beachner Co.'s motion to dismiss the indictment and the government's motion to sever defendant Jerry Beachner's case for trial. The court found that the alleged bid-rigging schemes regarding the aforementioned highway projects were each part of a single, continuing conspiracy which had existed in Kansas since the early 1960's. Thus, the court reasoned that to prosecute Beachner Co. under the second indictment would effectively put it in jeopardy twice for the same offense in violation of the fifth amendment to the United States Constitution.

The issues presented on this appeal are whether the district court erred (1) in finding that the second indictment against Beachner Co. encompasses the same conspiracy in which it was previously acquitted, and (2) in dismissing the three mail fraud counts in the indictment along with the Sherman Act counts because it found the existence of a single Sherman Act conspiracy. We agree with the district court that a single, continuing bid-rigging conspiracy was present in this case. Further, we hold that the mail fraud actions were an integral part of the overall bid-rigging scheme; hence, it was proper for the district court to dismiss the entire *Beachner II* indictment filed against Beachner Co.

## I.

## BACKGROUND

At the double jeopardy evidentiary hearing, both the government[3] and Beachner

---

* Honorable Earl E. O'Connor, Chief Judge, United States District Court for the District of Kansas, sitting by designation.

1. The indictment specifically charged the defendants (1) with entering into and engaging in a combination and conspiracy to suppress and eliminate competition for the construction of that project, and (2) with defrauding the State of Kansas and the United States by causing a warrant to be delivered through the United States mail as payment of the project. (R., Vol. 2 at 238–39.)

2. On March 2, 1982, Robert Beachner was again indicted for the same alleged offenses as detailed in the February 4 indictment. The government elected to proceed against Robert Beachner on the March 2 indictment and against Beachner Construction Co. on the February 4 indictment. (*Id.* at 239.)

3. The government also presented the evidence it proposed to use in the *Beachner II* trial to prove the charges alleged in the second indictment. This evidence consisted of grand jury testimony and affidavits relating to the alleged bid-rigging

Co. introduced evidence, including testimony by seven Kansas asphalt contractors, which established the following facts. The Kansas Department of Transportation occasionally holds competitive bid-lettings for state highway construction projects which require asphalt work. Since the 1960's, however, a scheme to submit collusive bids has often been used by the state asphalt contractors to allow them to avoid competition and ensure higher profits (R., Vol. 6 at 59–64; Vol. 8 at 512). Specific terms such as "setup job" and "comp bid" or "complementary bid" were familiar industry-wide in Kansas for at least the past twenty years[4] (R., Vol. 6 at 59, 69–70, 165–67, 169–71, 217–19, and 222–24; Vol. 7 at 311–12 and 338–39; Vol. 8 at 428–29, 487–88, and 512–13). This terminology has been preserved although the "method" of bid-rigging within the Kansas highway asphalt paving industry had changed slightly over time.

Until 1972, San Ore Construction Company had directed the bid-rigging. Contractors would contact San Ore's President, Clare Miller, if they wanted to be awarded a particular job (R., Vol. 6 at 92). At the beginning of each year, the contractors would meet to study the list of state jobs planned for letting. Miller would then allocate the available jobs among the interested contractors (R., Vol. 6 at 139; Vol. 7 at 384 and 387). When a setup project was open for bids, the designated "setup" contractor telephoned the other bidders to inform them of the price to bid above (R., Vol. 6 at 140). When San Ore went out of business in the early 1970's, the contractors ceased meeting on an annual basis.

Further, the state stopped issuing the lists of planned highway projects far in advance of the time for letting (R., Vol. 6 at 141 and 150–51).

Although the contractors no longer followed the "yearly" method of bid-rigging, all contractors involved after San Ore's dissolution followed the *same procedure* for "setting up" a job as was used previously (R., Vol. 6 at 79–80, 91–94 and 117; Vol. 8 at 512–13). This common procedure was that a contractor interested in setting up a job would contact other contractors potentially-interested in bidding and obtain their cooperation—the other contractors would either submit "comp" bids or refrain from bidding on the particular job (R., Vol. 6 at 108–10 and 174; Vol. 7 at 245–46 and 369–71). If a "setup" contractor was subsequently unable to rig the bidding, he was expected to advise the other bid-rigging participants of that inability (R., Vol. 6 at 79 and 175). Further, if one bidding contractor refused to participate in the desired scheme for a particular job, the job was bid competitively (R., Vol. 8 at 518–19). In fact, recently, more than eighty percent of all jobs were bid competitively (R., Vol. 6 at 198; Vol. 7 at 274–75 and 386–87; Vol. 8 at 425).

The incentive for a contractor to "go along" with a proposed setup job by submitting a complementary bid, or no bid at all, was that he could depend on the "setup" contractor to return the same favor at a future bid-letting[5] (R., Vol. 6 at 131). If this reciprocal obligation did not occur, the original "comp bidder" would ordinarily refuse to cooperate again with the original

of the projects in Cowley County, Bourbon and Allen Counties, and in Neosho and Montgomery Counties. *See Brief for Appellant United States of America* at 4–7.

**4.** The term "set up job" means that the bids on a project were rigged by one contractor designated to submit a low bid and the other bidders would submit higher bids designed to insure that the low bidder would be awarded the job. (R., Vol. 6 at 61). The term "comp bid" or "complementary bid" means a bid submitted, not for the purpose of being awarded a job, but instead as a favor to other contractors to present a false impression of competition for

the job. Thus, the "set up" contractor's bid would appear legitimate. (R., Vol. 6 at 69–70, 170 and 223).

**5.** In its opening brief, the government urges that this "incentive" was more often the exception than the rule: "generally, submission of a complementary bid was not contingent on any 'trade-off.'" *Brief for Appellant United States of America* at 9. Other reasons expressed by several witnesses for giving complementary bids included "to keep the peace," or to protect one's "home territory." *Id.* at 9–10.

"setup" contractor (R., Vol. 7 at 236–37). Thus, the bid-rigging scheme was most prevalent when a large amount of asphalt work was available because in less active times, fewer future benefits were possible for the other participating contractors (R., Vol. 6 at 81–82, 132 and 182). Contractors were apparently less willing to participate in bid-rigging for another's instant benefit when they all needed work to stay in business.

## II.

### A. *Double Jeopardy*

The double jeopardy clause of the fifth amendment provides that no person shall "be subject for the same offence to˙be twice put in jeopardy in life or limb ...." U.S. Const. amend. V.[6] That clause may not properly be invoked unless both the first and second trials involve the "same offence." *United States v. Ewell,* 383 U.S. 116, 124, 86 S.Ct. 773, 778, 15 L.Ed.2d 627 (1966). To determine if Beachner Co. was indicted a second time for the same offense of which it had previously been acquitted, our primary concern is whether the alleged actions by Beachner Co. relating to the asphalt projects enumerated in *Beachner II* comprised a separate conspiracy to rig bids, or whether those actions were part of a single, continuing conspiracy to rig bids. If a single conspiracy is found to have existed, Beachner Co. may not be tried twice for that offense. When making such a determination, we have held that:

> the pertinent inquiry is whether the record ... is sufficient to establish that [all conspirators] had a *single, common and continuing objective* .... If so, there would be but one conspiracy even though its purposes were advanced ... by diverse parties.

*United States v. Wilshire Oil Co. of Texas,* 427 F.2d 969, 976 (10th Cir.1970), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970) (emphasis added).[7]

■ The standard we must apply in reviewing the district court's finding of a "single, continuing conspiracy" is whether it was "clearly erroneous." *United States v. Jabara,* 644 F.2d 574, 577 (6th Cir.1981). *See also United States v. Comosona,* 614 F.2d 695, 697 n. 4 (10th Cir.1980). A finding of fact is clearly erroneous when the appellate court " 'is left with the definite and firm conviction that a mistake has been committed.' " *United States v. Jabara, supra* at 577 (quoting *United States v.*

**6.** The underlying theory of this constitutional prohibition was expressed by the Supreme Court in *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957):

> [T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

**7.** In *Wilshire,* the court held that the evidence supported the trial judge's conclusion that multiple conspiracies existed. Wilshire Oil Company had sold liquid asphalt to the State of Kansas while allegedly participating in a conspiracy to fix the price of such asphalt. *See United States v. Wilshire Oil Co. of Texas,* 427 F.2d 969, 972 (10th Cir.1970), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). The basis for Wilshire's double jeopardy contention was that it and other oil companies had been previously tried and convicted in another federal court for an asphalt conspiracy in Missouri. The *Wilshire* court rejected that contention, holding that there was sufficient evidence in the record to support a conclusion that there was no "common objective" between the participants in *both* states to fix prices of liquid asphalt in *Kansas. Id.* at 977.

The *Wilshire* court also noted, *inter alia,* that the offenses charged in each case varied: the Missouri indictment charged the defendants with conspiring to " 'suppress and eliminate competition in the sale of liquid asphalt,' " but the Kansas indictment charged the defendants with conspiring " 'to fix, maintain, and establish non-competitive prices for the sale of liquid asphalt.' " *Id.* at 975. This distinction was pointed out by the court in application of its holding that "prosecution for one offense will not confer immunity from subsequent prosecutions of distinct, though related, offenses." *Id.* That is not a concern in the instant case; Beachner Co. was charged, in each indictment, with the same offenses—conspiracy to rig bidding of the asphalt aspect of state highway construction projects and mail fraud.

*United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). After reviewing the entire record, we hold that the district court was not clearly erroneous in finding the existence of a single, continuing conspiracy to rig bids in the asphalt industry in Kansas.

The court based this finding on several grounds: (1) there existed (for more than twenty-five years) a continuous, cooperative effort among Kansas asphalt contractors to rig bids and there was a "common objective" by all participants to eliminate price competition (R., Vol. 2 at 245), (2) although the overall system of bid-rigging has varied slightly throughout the years, a "common method" of "setting up" a job was persistent (*Id.*), (3) common bid-rigging jargon was well-known and freely used throughout the industry for the twenty-five-year period (*Id.* at 246), (4) the participating contractors took no precautions and expressed no fear when approaching a fellow contractor to rig a bid (*Id.*), (5) mutual and interdependent obligations were created between participating contractors (*Id.*), and (6) although witnesses denied that an agreement for a single conspiracy existed, the bid-rigging scheme was self-perpetuating in nature and could be "plugged into" at any time (*Id.* at 247).

The district court further supported its decision with a detailed discussion of prior case law, particularly *United States v. Consolidated Packaging Corp.,* 575 F.2d 117 (7th Cir.1978). *See also United States v. Rodgers,* 624 F.2d 1303 (5th Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v.*

*David E. Thompson, Inc.,* 621 F.2d 1147 (1st Cir.1980); *United States v. American Honda Motor Co.,* 271 F.Supp. 979 (N.D. Cal.1967); *United States v. H.E. Koontz Creamery, Inc.,* 257 F.Supp. 295 (D.Md. 1966). In *Consolidated Packaging,* a one-count indictment charged twenty-three folding carton companies with engaging in a nation-wide price-fixing conspiracy. Consolidated, the only defendant company to go to trial, was convicted. The issues before the appellate court were (1) whether the government's evidence was sufficient to establish one, nation-wide conspiracy and (2) whether the evidence showed that Consolidated was a participant in that conspiracy. 575 F.2d at 120. The court held that the evidence was sufficient to establish a single conspiracy, *id.* at 128, and that Consolidated was part of a conspiratorial agreement, although tacitly. *Id.* at 127. We agree with the district court that the circumstances of *Consolidated Packaging* are similar to the instant case.

Although *Consolidated Packaging* did not involve a double jeopardy question, the case turned on the issue of whether there was one or several conspiracies. The evidence presented in both cases revealed (1) the existence of common bid-rigging jargon prevalent industry-wide, (2) the participants had no fear of initiating the setup of a bid, (3) the perpetual nature of the bid-rigging scheme, and (4) the existence of a tacit mutual understanding among competitors of a single, continuing conspiracy.[8] *See* R., Vol. 2 at 254–55.

The government contends, however, that the evidence presented in this case estab-

---

**8.** We are not persuaded by the government's attempts to distinguish *Consolidated Packaging* from the present case. Its arguments concerning the difference in the issues and the circumstances are without merit. Further, the government points to the following language in *Consolidated Packaging* which it feels "supports" its decision to prosecute participants for "separate conspiracies" (*See Brief for Appellant United States of America* at 28):

> If the conspirators could make the conspiracy work and minimize price competition, all conspirators could expect a more profitable survival due to the artificially established higher prices. That to accomplish this, *there*

> *were spawned numerous other lesser conspiracies related to specific bids* does not create a variance.... *The government might also have proceeded piecemeal with numerous indictments against each conspirator alleging the lesser conspiracies.*

575 F.2d at 128 (emphasis by government).

Although it may be true that the above-quoted language supports the government's decision to prosecute "each" participant by a piecemeal approach, this language does not (and no court could justifiably) support the government's attempt to prosecute "one" alleged participant *twice* for its actions within *one* conspiracy.

lished that the alleged bid-rigging actions pertaining to each project produced separate conspiracies involving separate agreements to rig particular projects let by the state on particular dates. *See Brief for Appellant United States of America* at 16, 18–20. Further, the government asserts that the evidence does not reveal any interdependence between participating contractors as a result of their actions on a particular rigged job. Because each job could be rigged only after individual negotiations at the time of the letting, the government argues essentially that the participating contractors would not usually base their decision to "go along" with the rigging on the reliance of a future "favor" from another contractor. Thus, the government concludes that there is not sufficient evidence of a single conspiracy. *Id.* at 18. These contentions are without merit.

■ First, the government appears to urge that a "formal agreement" to continue one overall scheme is necessary to prove that a single conspiracy existed. The government contends, of course, that there was no evidence of such an agreement— there was only evidence of "letting-by-letting" agreements. However, it is well settled that a formal agreement is not necessary to form a criminal conspiracy. *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946); *United States v. Zang*, 703 F.2d 1186, 1191 (10th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 103, 78 L.Ed.2d 107; *Consolidated Packaging, supra* at 126. It is enough that the participating parties have a tacit understanding

based upon a long course of conduct. *Direct Sales Co. v. United States*, 319 U.S. 703, 714, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943); *Consolidated Packaging, supra* at 126; *United States v. Robinson*, 470 F.2d 121, 123 (7th Cir.1972). The evidence showed that asphalt contractors in Kansas understood for over twenty-five years that the ability to rig bids was available using the aforementioned method. There was, therefore, no lack of conspiratorial agreement in this case.

Second, the weight of the evidence in the record shows that a contractor would participate in a bid-rigging plan with the belief that future benefits of some kind would be returned to him. No matter what the specific reasons for participating were,[9] they were always that a contractor would eventually benefit in some way—usually through another's cooperation with his desire to set up a job.

■ We hold that a review of the testimony presented at the evidentiary hearing reveals that a common objective was shared by each participating contractor: *to eliminate price competition and ensure higher individual profits.* Because a common objective between the contractors has been established in the record, that is sufficient for us to hold that a single conspiracy existed. We do not find any error in the findings of the district court; hence, there is substantial evidence in the record to support a finding of a single conspiracy. Beachner Co. was, therefore, indicted for the same offense in *Beachner II* that it had previously been acquitted of in *Beachner I.*[10]

---

**9.** *See supra* note 5 and accompanying text.

**10.** The government moderately disputes the district court's decision regarding the bearer of the burden of proof in the double jeopardy evidentiary hearing. Following *United States v. Inmon,* 568 F.2d 326, 332 (3d Cir.1977), *aff'd on reh'g,* 594 F.2d 352 (1979) and *United States v. Jabara,* 644 F.2d 574, 576–77 (6th Cir.1981), the court found that the defendant has the initial burden to *produce* evidence of double jeopardy (advancement of a *prima facie* non-frivolous claim). If the defendant meets that requirement, the burden then shifts to the government

to *persuade* the judge, by a preponderance of the evidence, of the existence of multiple conspiracies and thus no double jeopardy prohibition (R., Vol. 2 at 241). The government asserts that this was error since the law in this Circuit places the burden of *persuasion* on the *defendant. See Brief for Appellant United States of America* at 13 n. 9 (citing *United States v. Rumpf,* 576 F.2d 818, 823 (10th Cir.1978), *cert. denied,* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1979)). Alternatively, the government urges that the record nevertheless shows it met the burden placed upon it by the district court. *Id.*

### B. *The Mail Fraud Charges*

 The government contends that the district court erred by dismissing the entire indictment against Beachner Co. since such a decision improperly included the three counts of mail fraud. The essence of the government's argument is that even if each of the mailings derived from a single scheme to defraud, each mailing is a separate crime. *See Brief for Appellant United States of America* at 31–32 (citing *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916); *United States v. Ledesma*, 632 F.2d 670, 679 (7th Cir.1980), *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *United States v. Clevenger*, 458 F.Supp. 354, 359 (E.D.Tenn.1978)).

Beachner Co. initially asserts that because the government failed to raise this contention before the district court, the government waived its right to argue this in the first instance on appeal. *See United States v. Ford*, 525 F.2d 1308, 1310 (10th Cir.1975). Further, Beachner Co. contends that the "plain error" rule expressed in Rule 52(b) of the Federal Rules of Criminal Procedure [11] is not applicable to the government. Although we agree with Beacher Co.'s contentions, we further hold that the alleged mail fraud actions were an integral part of the alleged bid-rigging scheme. Likewise, the mail fraud charges are encompassed in the Sherman Act bid-rigging conspiracy charges. The *Beacher I* and *Beachner II* indictments alleged that the scheme to defraud the State of Kansas included (1) Beachner Co.'s submission of collusive bids to the state and (2) the fact that Beachner Co. caused a warrant for payment (check from the State of Kansas) to be delivered through the United States mail. Thus, in order for the government to prove the mail fraud charges made in *Beachner II*, it *must* also prove the conspiracy alleged in the Sherman Act counts in the same indictment. The district court, therefore, properly dismissed the entire *Beachner II* indictment on double jeopardy grounds.

AFFIRMED.

---

It is true that our cases seem to place the burden of persuasion on the party moving for dismissal based on double jeopardy. *See United States v. Rumpf, supra; United States v. Martinez*, 562 F.2d 633, 638 (10th Cir.1977); *United States v. Wilshire Oil Co. of Texas, supra* at 976 n. 12. Even so, the record in this case shows, by a preponderance of the evidence, that a single conspiracy existed and, thus, Beachner Co. was entitled to a dismissal based on double jeopardy. This was the implicit finding of the district court when it determined that the government's evidence of multiple conspiracies did not "outweigh" Bechner Co.'s evidence of one conspiracy.

11. Rule 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed [by the appellate court] although they were not brought to the attention of the [trial] court."