UNITED STATES of America, Appellee,

v.

DAVID E. THOMPSON, INC.,
Defendant, Appellant.

No. 79–1352.

United States Court of Appeals,
First Circuit.

Argued Jan. 9, 1980.

Decided April 23, 1980.

Jerry E. Benezra, Melrose, Mass., and Richard B. Bachman, with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., was on brief, for defendant, appellant.

Susan J. Atkinson, Atty., Dept. of Justice, Washington, D.C., with whom John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson, Washington, D.C., Eugene P. Hanson, New York City, Edward Friedman, Washington, D.C., and Rebecca Meiklejohn, Attys., Dept. of Justice, New York City, were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This appeal is from a criminal conviction under the Sherman Antitrust Act, 15 U.S.C. §§ 1–7 (1976),[1] of the corporate defendant David E. Thompson, Inc. (Thompson, Inc.), for conspiring with numerous other corporations and individuals to allocate among themselves architectural hardware projects in several New England states by submitting collusive, "rigged" bids on such projects. In support of its appeal Thompson, Inc. claims that the district court erred by (1) refusing to accept a proffered plea of *nolo contendere*, (2) by denying a motion for judgment of acquittal, (3) by applying an incorrect standard in admitting certain out of court statements of coconspirators, (4) by admitting into evidence allegedly irrelevant testimony and exhibits, and (5) by improperly instructing the jury concerning a presumption as to the duration of the conspiracy and refusing to instruct the jury that it might consider the defendant's stake in the conspiracy. After carefully examining the record in this complicated case, we affirm.

FACTS

The prosecution's case at trial consisted in large part of the immunized testimony of several individuals engaged in the architectural hardware business, particularly Robert McCabe, president of Campbell Hardware, Inc. Architectural hardware includes items such as door knobs, locks, hinges, and the like used in commercial buildings. These items are generally incorporated into new commercial buildings according to specifications drawn by the building architects, who sometimes rely upon the assistance of an architectural hardware supplier. The architects generally invite bids to supply the hardware called for in the specifications, with the contract usually going to the

---

1. Criminal penalties for violations of the Sherman Act are set forth in the Antitrust and Penalties Act of 1974, 15 U.S.C. §§ 3, 24 (1976).

low bidder. In some instances, bids have been allowed by invitation only, with as few as three firms receiving invitations.

Sometime prior to 1962, bid rigging became a widespread practice among suppliers in the Boston area. A group of Boston suppliers of architectural hardware began meeting for the purpose of facilitating the rigging of bids in order to allocate projects among themselves. The purported aim of the bid rigging was to ensure that the supplier who assisted the architect in drawing up the specifications, often at substantial unreimbursed cost, received the contract. The rigging of bids was made possible by the fact that architects often asked the assisting supplier to select the firms invited to submit bids. Thus, when one of the members of the group drew up specifications for a project, he invited two or more other members of the group, and no one else, to submit bids which were in excess of his own bid.

From the very fact that putative competitors collaborated in such a way with one another, we can infer that the essence of this practice, or conspiracy, lay in its reciprocal nature. Each conspirator could assume that if he forewent the opportunity to underbid a coconspirator, he would receive a reciprocal, "complementary" bid in return on a future project. In this fashion, the conspirators ceased to compete with one another on a significant number of projects and the purchasers of their products, thinking they were receiving the benefits of competitive bidding, were cheated.

The involvement of Thompson, Inc. in the bid rigging activity began sometime in the mid-1960's. The company's founder and first owner-president, David E. Thompson, became aware of the bid rigging practice in the 1950's when he was part owner of another firm which participated in the bid rigging scheme. Shortly after Thompson formed Thompson, Inc., he contacted Robert McCabe and William Davies, two members of the group that met for the purpose of allocating projects among its members. In the jargon that the conspirators had developed, Thompson asked if McCabe and Davies would "go along" with him on a Bentley College project and submit "cover bids". At about this same time, approximately 1965, Thompson attended a fullscale meeting of the many firms engaged in bid rigging. Shortly thereafter, Thompson, Inc. bid successfully on the Bentley project with several other firms represented at the meeting submitting higher bids. Soon after the Bentley project, Thompson, Inc., reminded of its obligation to reciprocate, agreed to submit a "cover bid" for William Davies's successful attempt to secure the contract on an office building in Burlington, Massachusetts.

By 1970 bidding procedures had begun to change in the industry and as the conspirators found that they were writing fewer and fewer specifications it became more difficult for them to exercise control over the selection of firms who were invited to bid on projects. This change, accompanied by a perhaps surprising resurgence of competitive disagreements between representatives of various firms, brought an end to the chummy annual or semiannual restaurant meetings of the conspiring firms in 1970. However, some of them, including Thompson, Inc., apparently did not want to lose what seemed to be a comfortable modus operandi. Thus, a meeting of at least eight of the firms who had previously worked together in rigging bids was held at the Lexington Inn in Massachusetts. The members of this group, despite their efforts, were unable to come to an agreement on how to restore the level of bid rigging to its previous high point.

Several of the conspirators, however, not stymied by the failure of the full group to reach a consensus, persisted in their attempts to work together to rig bids. After the 1972 meeting, Robert McCabe, a long time, hard core conspirator, contacted Thompson, Inc. and several other firms that had previously attended meetings and, as had been the practice for over a decade, asked them to "go along" with him and submit "cover" bids on a Federal Reserve Building project. Faced with some apparent reluctance, McCabe sweetened his re-

quest with cash payments ranging from $1500 to $3500 and thereby secured sufficient compliance. Thompson, Inc. received $3500 and submitted a bid on the project in excess of McCabe's.

In the summer of 1973, McCabe again wished to rig bids and made the usual requests to several firms. He instructed Campbell Hardware, Inc.'s vice-president, John Madden, to ask Thompson, Inc. to "go along". Thereafter, Thompson, Inc. and several other firms contacted by McCabe submitted bids in excess of that of Campbell Hardware, Inc., which won the contract.

During the following few years McCabe actively engaged in efforts to ensure that the art of bid rigging was not forever lost. On some projects, he expressly sought "cover bids" from Thompson, Inc., and on others he apparently did not. On projects of both types, Thompson, Inc. in fact submitted bids higher than McCabe's, which were substantially in excess of the amounts which he would have submitted if he had thought that the bidding would in fact be competitive.

During these same years, H.C.I. Corp., an architectural hardware supplier in Maine, apparently became aware of the Boston firms' practices and contacted McCabe and Thompson, Inc. for cover bids on several Maine projects. Quickly accustoming itself to the conspirators' methods, H.C.I. Corp. exchanged cover bids on several projects with Thompson, Inc. through David Thompson himself and through C. Robert Taylor, Thompson's successor as appellant's president-owner.[2]

In 1977 Taylor contacted a vice-president of Campbell Hardware and made the customary request for cover bids on two projects. Campbell Hardware complied on both occasions, bidding as instructed by Taylor, and on at least one of these occasions Thompson, Inc. won the contract. During the same year, Thompson, Inc. provided reciprocal services for Campbell Hardware on a contract for a Housing for the Elderly project, which Campbell won.

## I. REJECTION OF NOLO CONTENDERE PLEA

Appellant attempted to enter a plea of *nolo contendere* before trial.[3] The government indicated that it opposed the acceptance of such a plea. The district court, citing its "practice to decline to accept an offer of a plea of *nolo* so long as the government does not consent to it", refused to accept the proffered plea. Appellant points to this decision as error, claiming that the court incorrectly delegated to the prosecution its independent duty to determine whether acceptance of the plea would be in the public interest.

"[A]cceptance of a *nolo* plea is solely a matter of grace. . . ." *United States v. Cepeda Penes*, 577 F.2d 754, 756 (1st Cir. 1978). We know of no case in which an appeals court reversed a district court's refusal to accept a plea of *nolo* not supported by the prosecution. Indeed, we know of only one case in which a district court accepted a plea of *nolo* over the government's objection, *United States v. Cigarette Merchandisers Ass'n, Inc.*, 136 F.Supp. 212 (S.D. N.Y.1955), and that particular case involved a rather unusual procedural situation. *See United States v. Standard Ultramarine & Color Co.*, 137 F.Supp. 167, 174 (S.D.N.Y. 1955).

Whether it therefore follows that it is never an abuse of discretion for a district court to reject a plea of *nolo* when the prosecution opposes acceptance of the plea we need not decide. Entry of the plea in this antitrust case would have deprived the victims of the conspiracy of a significant opportunity in subsequent civil actions to

---

**2.** Taylor started working at Thompson, Inc. in 1966. In 1975 he became president of the firm and subsequently purchased all of the company's stock from David Thompson. Thompson remained with the firm and is now its treasurer.

**3.** Four other corporate defendants entered pleas of *nolo* which the government supported and the court accepted. Campbell Hardware, Inc., H.C.I. Corp., Contract Hardware, Inc., and Dudley Hardware Co. were fined $25,000, $15,-000, $7,000 and $15,000, respectively.

benefit from the government's efforts.[4] It is therefore almost inconceivable that the district court could have found acceptance of the *nolo* plea to be in the public interest when the prosecution was prepared and willing to go to trial.

Appellant also implies that the fact that the prosecution supported the *nolo* pleas of the other corporate defendants created a right on the part of appellant to plead *nolo* as well, or at least a reason to scrutinize the prosecution's decision. Appellant cites no pertinent authority for this proposition, and we find no merit in it. The prosecution's decision concerning plea recommendations is to be made according to the dictates of its own discretion and we need not inquire into its reasoning.

■ Finally, we also reject the argument of appellant that the government's decision not to support appellant's *nolo* plea raised "serious questions of due process, equal protection and fundamental fairness" in light of an earlier government offer to support a *nolo* plea if Taylor pleaded *nolo* as well. It was well within the government's discretion to determine that it was a wise use of resources to forego plea bargaining in favor of a trial unless at least two of the three remaining defendants were willing to enter *nolo* pleas.

## II. MOTION FOR ACQUITTAL

### A. *Knowing participation in the conspiracy*

■ Appellant contends that there was insufficient evidence to show that it knew of the conspiracy and intended to become a part of it. This contention flies in the face of the evidence. Evaluated in a light most favorable to the government, *United States*

*v. Miller*, 589 F.2d 1117, 1136 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), the evidence as summarized in the beginning of this opinion shows that appellant's first president, David E. Thompson, was aware of the bid rigging practices, attended at least one of the full-scale meetings of the conspirators, and collaborated with members of the group on numerous occasions to rig bids on a number of projects. The fact that most of the evidence was circumstantial does not alter this conclusion. *See Harney v. United States*, 306 F.2d 523 (1st Cir.), *cert. denied*, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171 (1962). "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### B. *One conspiracy or several?*

■ Appellant was indicted and tried for participating in a single, wide ranging conspiracy running from approximately 1962 to 1977. Appellant contends that the evidence produced at trial varied from the indictment and showed that at the very least there were two separate conspiracies, one running from 1962 to 1970, when the full-scale group meetings terminated, and one running from 1972 on. In support of this contention, appellant points to the testimony of the government's chief witness, Robert McCabe, who stated that the group died out around 1970 and efforts to revive it in 1972 failed. Appellant points also to the changes in industry practices which rendered the former, purported [5] aim of the conspiracy—the allocation of contracts to

---

4. Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a) (1976), makes a criminal judgment in an antitrust case prima facie evidence in a subsequent civil action. Generally, pleas of *nolo* do not have such an effect. *See Developments in the Law—Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1351–56 (1979).

5. Appellant places substantial emphasis upon McCabe's testimony that the aim of the conspiracy was not to price gouge but rather sim-

ply to ensure that the writer of the specifications won the bidding and thus received compensation for his efforts. The fact is, however, that the clearly foreseeable, and thus intended, effect of the conspiracy was to circumvent competitive bidding and obtain contracts at amounts well in excess of the amounts which would have prevailed had the conspiracy not existed. McCabe's testimony showed that this in fact occurred.

the writer of the specifications—no longer feasible.

"The question of whether the facts indicate one or more distinct conspiracies is normally a matter of fact to be determined by the jury." *United States v. Brown*, 495 F.2d 593, 598 n. 5 (1st Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 226, 42 L.Ed.2d 179 (1974). In addition, even if the evidence showed two—or more—conspiracies rather than one as charged in the indictment, "such a variance would only be fatal if it actually prejudiced the defendant, or adversely affected his substantial rights." *Id.* at 599 n. 6.

After examining the record, we find that there was sufficient evidence to allow the jury to find that there was a single, 15-year conspiracy as charged in the indictment. While certain original members of the conspiracy apparently dropped out of it and while new firms were drawn into the group, there was a sufficient "core" group, including appellant and McCabe, who worked together on and off throughout most of the entire period. "A finding of a single conspiracy is not defeated merely because of personnel changes." *United States v. Ochoa*, 609 F.2d 198 at 201 (5th Cir. 1980). Most importantly, the unchanging jargon, the implied reciprocity, and the facility with which each additional series of bids were rigged with a minimum of planning and communication makes reasonable an inference of continuity which suffices to rebut appellant's claim that each incident of bid rigging was approached on an isolated, *ad hoc* basis.

> "It does not appear that a competitor needed to approach each new bid-letting occasion in search of some dishonest accommodation with the great care or caution which might reasonably be anticipated in an isolated instance of soliciting illegal cooperation with a competitor. The rules . . . appear to have been recognized and accepted." *United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 121 (7th Cir. 1978).

Additionally, even if we were to accept appellant's argument that the first conspiracy ended in 1970 and a new, separate one began later, we see no prejudice to appellant from the variance which would result. If there were two conspiracies, the evidence amply showed that appellant was a member of both.[6] Hence it could not have been unfairly harmed by having attributed to it the crimes of a conspiracy of which it was not a part. *See Monroe v. United States*, 234 F.2d 49 (D.C.Cir.), *cert. denied*, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); *Canella v. United States*, 157 F.2d 470 (9th Cir. 1946).

## III. ADMISSION OF COCONSPIRATORS' STATEMENTS

On the fourth day of trial, the prosecutor asked John Madden, vice-president of Campbell Hardware, Inc., to relate certain conversations he had with Robert McCabe concerning appellant. Counsel for appellant objected on the grounds that "no conspiracy has been shown that [appellant] was in." The district court ruled on the objection as follows:

> "In order to make sure that the record is clear so far as the future is concerned, I would make a finding on the record in light of the evidence that has now been introduced that there is a sufficiency of evidence for the jurors to find the existence of a conspiracy; that there is also a sufficiency of evidence for the jury to find knowing participation in the conspiracy by [David Thompson and Robert Taylor]; and a sufficiency to find a joinder in the conspiracy by the corporation by an authorized representative."

Appellant's counsel objected to the ruling "on the basis that the evidence shows so far that if there was any conspiracy, that conspiracy terminated in approximately 1970; that C. Robert Taylor was not shown to be

---

**6.** David Thompson's attendance at one of the group dinner meetings in the mid-1960's and Davies's testimony that Thompson was aware of the group's activities, together with Thompson's subsequent successful request for "cover bids" and his compliance with Davies's requests for the same, suffice to support a finding that Thompson, Inc. was a member of the conspiracy at that time.

a member of that conspiracy; that David E. Thompson was not shown to be a member of that conspiracy"; and that there was no "conspiracy at all in which the defendants were parties."

On the sixth day of trial, in ruling upon a subsequent motion to strike certain out of court declarations, the court stated that "by a preponderance of the evidence . . . there was a conspiracy to allocate projects by rigging bids" and that the "declarations occurred during the time that the alleged conspiracy was going on."

On this appeal, appellant for the first time [7] asserts that these rulings by the district court were incorrect under the rule announced in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). In *Petrozziello*, we announced that district courts should not admit out of court declarations of co-conspirators under Fed.R.Evid. 801(d)(2)(E) without first finding that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Id.* at 23. Appellant now asserts

that the "sufficiency of the evidence" language used by the district court was not in accord with the *Petrozziello* standard and was instead more like the prima facie standard which we found inadequate.

■ Whether or not the district court's language is in the abstract adequate under *Petrozziello* we need not decide. In the absence of proper objection, Fed.R.Evid. 103(a)(1), a deviation from the standard announced in *Petrozziello* will be reversed only upon a showing of plain error. *United States v. Pappas*, 611 F.2d 399 (1st Cir. 1979). In this case, the error is far from plain. Indeed, it is not clear that there was any error at all, for it might be possible to find that when read together the district court's two rulings constituted a proper application of the *Petrozziello* standard.[8] In any event, our discussion of the evidence in the previous sections of this opinion shows that there was enough evidence to support a finding under the proper standard and our reading of the record leads us to believe that the district court would have so found if counsel had properly objected.[9]

---

7. We have examined carefully the discussion between the district court and counsel leading up to the ruling on the sixth day of trial for any indication that the point which appellant raises on this appeal was brought to the attention of the trial judge, but we can find none. That rather confusing discussion focused simultaneously on two issues: a motion for acquittal on the grounds of insufficient evidence, and a motion to strike the out of court declarations as hearsay. The district court stated erroneously that it did not have to determine whether a defendant was a member of the conspiracy (although on the fourth day of trial the court did make such a finding under the "sufficiency of the evidence" standard). Counsel for David E. Thompson disagreed, implying in doing so that it thought the court was referring to the acquittal motion. The court then stated,

"That is a different issue. The motion for a directed verdict is a different issue than the one I have been discussing as to the beginning and the end of the conspiracy . . . and whether or not particular declarations will be considered by the jury."

Counsel for David E. Thompson then replied, "That is inarguable. I think I am in the middle position. I don't disagree with your Honor's statement at all. My understanding of the law is that."

After a brief discussion of the evidence, the court then issued the ruling on the motion to strike the declarations. No objections followed.

If there were any basis to find an adequate objection in the above discussion, we would not hesitate to do so. However, despite the fact that the district court specifically requested assistance from counsel in making its ruling, we can see no possibility that the point raised on this appeal was brought to the attention of the court by the otherwise very competent counsel for the defendants.

8. The chief problem with the ruling made on the fourth day was the ambiguity of the "sufficiency of the evidence" language. The district court's later ruling using the "preponderance of the evidence" language indicates that the court may have meant that the evidence was sufficient since there was a preponderance. *Cf. United States v. Martorano*, 557 F.2d 1, 11 (1st Cir.), *on reh'g*, 561 F.2d 406 (1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978) (there was a "sufficient showing" to satisfy the *Petrozziello* standard).

9. The evidence is weakest with regard to the participation in the conspiracy of Taylor and Madden at the time of their conversation concerning which Madden testified. However, we

## IV. ADMISSION OF ALLEGEDLY IRRELEVANT EVIDENCE

██ Appellant asserts that we should order a new trial because the district court allowed into evidence exhibits and testimony concerning projects on which there was no direct evidence that Thompson, Inc. participated in any bid rigging. We agree with appellant that the probative value of some of this evidence was insubstantial. However, it did have some relevance in that it illustrated the nearly industry-wide (in Boston) acceptance of the bid rigging, thus negating the inference that the conspiracy had died out in 1970, and showed that one of the objectives of the conspiracy was to obtain excessive, noncompetitive profits, thus negating by inference appellant's claim that the conspirators abjured "price gouging". There was, as appellant claims, no direct evidence to link it with some of these projects; however, there was evidence—McCabe's testimony—from which one could infer that these projects were within the overall scope of the conspiracy which appellant had joined.

In light of the at least minimum level of relevance of this evidence, and the fact that appellant does not even assert that there was any possible prejudice as a result of its admission into evidence, we think that the district court's decision was probably correct, and if not, was harmless error.

## V. INSTRUCTIONS TO THE JURY

██ Appellant's final argument concerns two jury instructions, one which the district court gave, and one which it did not. In neither instance, however, did appellant object to the district court's decision. Indeed, when the court indicated that it was not going to give the requested instruction setting forth one of appellant's evidentiary

theories of the case because the court thought that a previous instruction covered the same ground, counsel for David E. Thompson was the only one to speak and he agreed with the court. Under Fed.R.Civ.P. 51, such failure to object forecloses appellant from raising the point on appeal in the absence of plain error, which we cannot find despite our own examination of the list of instructions.

*Affirmed.*

---

need not decide whether the evidence was so weak as to constitute plain error, because the statements by these two individuals were admissible against appellant on other grounds. At the time of the discussions, Taylor was president of Thompson, Inc. and Madden was a vice-president of Campbell Hardware and acting pursuant to instructions from McCabe. The discussions themselves concerned bids to

be submitted by the two firms. The statements of each individual are therefore attributable to their corporate principals, concerning both of whom there was more than ample evidence establishing their participation in the conspiracy. Additionally, Taylor's statements, as well as David Thompson's, were admissible against appellant as admissions by a party, Fed.R.Evid. 801(d)(2)(D).