UNITED STATES of America, Plaintiff,

v.

BEACHNER CONSTRUCTION CO.,
INC., and Jerry Beachner,
Defendants.

No. 82–20076–01.

United States District Court,
D. Kansas.

Jan. 31, 1983.

Richard J. Braun, Joseph H. Widmar, Mary C. Jones, Judy Whalley, U.S. Dept. of Justice, Chicago, Ill., for plaintiff.

Glen E. Casebeer, II, Curt Schneider, Schneider & Casebeer, Coffeyville, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter comes before the court on defendants' motion to dismiss a November 16, 1982, indictment returned against defendants Beachner Construction Co., Inc. and Jerry Beachner. As grounds for dismissal, the motion proffered the legal theories of double jeopardy, collateral estoppel, pre-indictment delay, vindictive prosecution and compulsory joinder. Alternatively, defendants moved for an election of counts. Also before the court is the government's motion to sever the trial of the two defendants.

The motion to dismiss was orally presented to the court on January 3, 1983, at which time said motion was denied as to the individual defendant, Jerry Beachner. As to the corporate defendant, Beachner Construction Co., Inc., the court took the motion under advisement and scheduled an evidentiary hearing for January 13, 1983, on the issues of double jeopardy and collateral estoppel only.

After reviewing the detailed briefs submitted by counsel, and having heard extensive oral argument and testimony in a three-day evidentiary hearing, the court grants the government's motion to sever the trial and further grants defendants' motion to dismiss the indictment as to Beachner Construction Co., Inc., for the reason that allowing this prosecution would be contrary to the double jeopardy provision of the Fifth Amendment to the United States Constitution.

## PROCEDURAL BACKGROUND

On February 4, 1982, an indictment was filed against Beachner Construction Co., Inc., a Kansas corporation, with its principal place of business at St. Paul, Kansas, and Robert T. Beachner, Secretary-Treasurer. The indictment alleged a violation of § 1 of the Sherman Act [15 U.S.C. § 1] and alleged mail fraud, in violation of 18 U.S.C. § 1341. Specifically, Count I charged defendants with having entered into and engaged in a combination and conspiracy to suppress and eliminate competition for the construction of project No. 135-40-I/IR-135-1(154) 30, Pts I & II [The Harvey County Project], let by the State of Kansas on February 7, 1980. Count II charged defendants with defrauding the State of Kansas and the United States by causing a warrant to be delivered by the United States Mail in payment of the above-referenced project.

On March 2, 1982, Robert T. Beachner was again indicted for the same alleged offenses as set forth in the February 4, 1982, indictment. The government chose to proceed against Robert Beachner on the March 2, 1982, indictment and against Beachner Construction Co., Inc., on the February 4, 1982, indictment. These two indictments are hereinafter referred to as Beachner I.

Both defendants proceeded to trial on May 3, 1982, and were acquitted of the conspiracy and mail fraud charges on the Harvey County Project by a jury verdict rendered on May 7, 1982.

On November 16, 1982, an indictment was returned by the grand jury naming Beachner Construction Co., Inc. and Jerry Beachner, a Vice-President of Beachner Construction Co., Inc., in charge of bridge construction, as defendants. This indictment, hereinafter referred to as Beachner II, contains six counts, three for violations of § 1 of the Sherman Act (15 U.S.C. § 1), and three for alleged mail fraud violations under 18 U.S.C. § 1341. The three projects which are the concern of Beachner II are Project Nos. 15-18RS-1362(3) (Cowley County), let on November 1, 1978; 54-1-KR-038-5(24) and 54-6-KR-038-5(25) (Bourbon and Allen Counties), let on April 25, 1978; and 160-63-KRL-65-1(35), 169-67-KRL-65-1(37), and 169-63-KRL-65-1(36) (Mont-

gomery and Neosho Counties), let on July 19, 1979.

The Beachner I and Beachner II indictments are identical, with the exception that Beachner II names Jerry Beachner in place of Robert Beachner, and specifies three different highway projects. With those exceptions, the identical "trade and commerce," the same "means" to accomplish the alleged offenses, and the same "effects" of the alleged offenses are alleged in both indictments.

It is in this posture the case came on for hearing before this court.

### THE EVIDENTIARY HEARING

#### A. *Burden of Proof*

As per *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), and *United States v. DiSilvio,* 520 F.2d 247 (3rd Cir.1975), which require consideration of a double jeopardy claim before a second trial if the defendant raises the issue in a pretrial motion, the court conducted an evidentiary hearing restricting proof to matters of double jeopardy and collateral estoppel. In conducting the hearing, the court was guided by *United States v. Inmon,* 568 F.2d 326 (3rd Cir.1977), *aff'd. on rehg.* 594 F.2d 352 (3rd Cir.1979), and the recent decision of the Sixth Circuit Court of Appeals in *United States v. Jabara,* 644 F.2d 574 (6th Cir.1981), regarding the burden of proof. The *Inmon* defendants were indicted for conspiracy to distribute and possession with intent to distribute heroin and distribution of heroin. In *Jabara,* the defendants were indicted for conspiracy to distribute cocaine and heroin and for interstate transportation in aid of racketeering in violation of the "Travel Act." Although neither case involved Sherman Act prosecutions, both courts were faced with a single/multiple conspiracy issue as in the instant case. The *Inmon* court burden-of-proof discussion concluded with the court finding:

"... when a defendant makes a non-frivolous showing that an indictment charges the same offense as that for which he

was formerly placed in jeopardy, the burden of establishing separate crimes—in this case separate conspiracies—is on the government. Besides the practical considerations respecting access to proof, to which we referred earlier, we also point to the obvious fact that it is the government which has control over the drafting of indictments. Any burden imposed by the imprecision in the description of separate offenses should be borne by it. To the extent that the *Reid* [*v. United States,* 177 F.2d 743 (5th Cir.1949)] and [*United States v.*] *O'Dell* [462 F.2d 224 (6th Cir.1972)] opinions suggest otherwise, we decline to follow them." *Id.* at 331–32.

*Jabara* similarly held that the burden to prove a single conspiracy lies with the defendant until a non-frivolous claim of double jeopardy is advanced. At that point, noted the court, the burden shifts to the government to show, by a preponderance of the evidence, that the conspiracies alleged in the two indictments are in fact separate.

■ In the instant case, the court finds defendant Beachner Construction Co., Inc. advanced a *prima facie* non-frivolous claim in its motion to dismiss which alleged the two indictments charged the same conspiracy. The offenses charged in both indictments had the same common objective and several of the same participants. Having met the threshold requirement of advancing a non-frivolous claim, the court finds the burden of proof shifted to the government to prove by a preponderance of the evidence the existence of multiple conspiracies. *See Inmon, supra.* The government failed to sustain their burden by the requisite preponderance of the evidence.

#### B. *Single/Multiple Conspiracies*

■ Defendant Beachner Construction Co., Inc. contends the projects which are the subject of the Beachner II indictment are merely subparts of but one overall, grand conspiracy existing among Kansas highway contractors to rig highway bids in the state of Kansas. Having been acquitted of the charge of conspiracy for the February 7,

1980, Harvey County bid-letting, defendant Beachner Construction Co., Inc. argues the Beachner II indictment places it in double jeopardy in violation of the Fifth Amendment. The court agrees.

The vitality and importance of the double jeopardy clause of the Fifth Amendment is demonstrated even today by the evergrowing number of cases. None of the more recent cases, however, better describe the general design and purpose of the clause than does *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

> "... The constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense....
>
> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Id.* at 187–188, 78 S.Ct. at 223.

See also *Serfass v. United States,* 420 U.S. 377, 387–388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975); and *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2160, 57 L.Ed.2d 24 (1978).

In *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the court stated:

> "... That guarantee [against double jeopardy] has been said to consist of three separate constitutional protections. *It protects against a second prosecution for the same offense after acquittal.* It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense...." *Id.* at 717, 89 S.Ct. at 2076. (Footnotes omitted.) (Emphasis added.)

Central to the task of determining whether or not the Beachner Construction Co., Inc. has been put in a position of having to defend twice for the same offense is the question of whether the bid-rigging scheme that permeated the highway construction business in Kansas from at least the early 1960s to the early 1980s constituted a single conspiracy or a series of individual, multiple conspiracies.

■ The crime of conspiracy to rig bids in violation of 15 U.S.C. § 1 is essentially an agreement among actual or potential competitors which restrains competition in or effecting interstate trade or commerce. *United States v. United States Gypsum Co.,* 600 F.2d 414 (3rd Cir.1979), *cert. denied* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). Conspiracy may be proved through circumstantial evidence. "Indeed, often if not generally, direct proof of a criminal conspiracy is not available and it will be disclosed only by a development and collocation of circumstances." *United States v. Manton,* 107 F.2d 834, 839 (2nd Cir.1938). *See also, Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■ Essentially, one test known by two names developed within the courts for determining whether one or multiple conspiracies exist. In the Tenth Circuit Court of Appeals, the test is known as the "common objective" test, and is based upon whether or not there is a common, continuing objective among the conspirators to fix, maintain and establish prices to suppress and eliminate competition. *United States v. Wilshire Oil Co. of Texas,* 427 F.2d 969, 976 (10th Cir.1970). If there is a common objective to eliminate competition, then a single conspiracy exists even though its purposes were advanced by diverse parties. *Wilshire* was indicted and convicted of a § 1 Sherman Act violation in the state of Kansas. Having previously been convicted for participation in an identical asphalt conspiracy in Missouri, defendant contended the Kansas prosecution twice placed it in jeopardy. The court, employing the common objective test, stated:

" . . . the pertinent inquiry is whether the record presented by Wilshire is sufficient to establish that it and all other oil companies indicted in Missouri and Kansas had a single, common and continuing objective of fixing, maintaining and establishing prices to suppress and eliminate competition in the sale of liquid asphalt to Kansas and Missouri. If so, there would be but one conspiracy even though its purposes were advanced in diverse states by diverse parties. Contrariwise, if the Missouri defendants did not share such broad objectives with their Kansas counterparts, but were attempting only to fix prices within their respective states, there were multiple conspiracies with each pursuing its own distinct illegal end." *Id.* at 976. (Footnote omitted.)

Other circuits, including the Eighth and Sixth Circuits, refer to the test as the "totality of the circumstances" test. *See United States v. Tercero,* 580 F.2d 312 (8th Cir.1978); *United States v. Jabara, supra.* The "same evidence" test employed by the courts in earlier cases has been rejected. Applying the test requires the court examine the evidence for a common objective or single purpose, common methods and procedures of operation, common jargon, and reciprocal or interdependent obligations, among other things.

After hearing testimony from several witnesses and having carefully reviewed the voluminous briefs submitted by counsel, the court, in applying the Tenth Circuit's "common-objectives" test, finds there was but one conspiracy to submit collusive bids on highway asphalt projects in the state of Kansas. The evidence clearly established that a continuous, cooperative effort among Kansas highway contractors to rig bids, thereby eliminating price competition, has permeated the Kansas highway construction industry in excess of twenty-five years, including the period of April 25, 1978, to February 7, 1980, the time period encompassed by the Beachner I and Beachner II indictments. This "cooperative effort" tradition was handed down from father to son. (Tr. Popejoy.) In support of its ruling, court makes the following findings.

Although the system of bid rigging in Kansas has varied slightly in the past twenty-five years, the usual and common method of "setting up" a job in the industry was as follows. After ordering proposals on the job or jobs in which a contractor was interested in bidding, a contractor desiring to allocate a certain job to himself would then contact other contractors he believed would also be interested in the job. He then persuaded them either to submit a "complimentary" or "comp" bid, or not to bid at all. "Complimentary bids" were sought for various reasons, but most often to ensure enough bids were submitted to have a job awarded (*i.e.,* to make the bidding appear legitimate), and in turn to have it awarded to the contractor who had "set it up" and to increase profit.

Evidence established that the terms "complimentary" and "comp" bid had existed in the industry as early as the 1960s, had identical meaning among contractors in the industry, and that all contractors were familiar with the terms. A "complimentary" or "comp" bid meant the submission of a bid at a letting that was not submitted for the purpose of being low bidder, but rather as a requested favor to the contractor who "set up" the job.

"Setting-up" a job was the process of negotiating for complimentary bids and was employed in the industry as early as the 1960s. This bid-rigging jargon was widely and freely used in the industry until the government investigation began in early 1980. The contractors who testified stated that when "setting up" a job, they took no precautions among themselves to assure secrecy. Although there was not always an assumption that whomever they talked to about "setting up" a job would "go along," none of the witnesses expressed any fear or concern that approaching a fellow contractor about this illegal activity would result in their being reported to the authorities; nor did they express any concern that a contractor would not know what they meant when asked if they would "go along." Having requested "comp" bids from contractors in

the past, witnesses stated they felt obligated or compelled to return the "favor" at future lettings. Hence, mutual and interdependent obligations were created among contractors who participated in "set up" jobs, whether it was by asking for a "comp" bid or giving one.

Witnesses testified that if a contractor sought to "set up" a job and convinced contractors one, two and three to go along, but failed to convince contractor four, the contractor who had attempted to "set up" the job had an obligation to call the first three contractors to inform them the job would be bid competitively. Don Popejoy, President of Popejoy Construction Company, testified there existed an unwritten rule or code in the industry that if one contractor would not "go along," then the job would be bid competitively. Although witnesses denied any overall agreement or understanding or participation in a single conspiracy, there can be no doubt that bid rigging was a way of life in the industry in Kansas. The court cannot imagine that any contractor was not aware of the prevailing practice or unfamiliar with the common jargon and mechanics of rigging a bid. All those who violated the law knew who would cooperate or "go along" and who would not. The bid-rigging scheme was of a self-perpetuating nature, built on economic gain and friendship within the industry. For this scheme to flourish on the grand scale that it did in the Kansas highway construction business, it took continuous cooperation among contractors.

The evidence showed that although not all lettings were rigged, whenever a contractor wished to "set up" a job, the conspiracy or understanding or agreement among contractors in the industry was available and could be invoked as a means of achieving that goal. The conspiracy was continuously present and could be "plugged into" at any time. The evidence established that unless out-of-state contractors or other unwilling contractors were bidding, or unless the letting occurred during a period when the State was letting few projects, the conspiracy could be invoked. When work was scarce, it was often bid competi-

tively because everyone needed the work. Incidents of bid rigging were more prevalent when work was plentiful.

Evidence of the interdependent or reciprocal nature of the conspiracy was elicited from Don Popejoy, who testified that "to get a job there had to be 'a trade-off for something else.'" (Tr. ___.) For example, Popejoy testified that Carlile, Smith & Siebert, were given complimentary bids by Popejoy at the February 7, 1980, letting in exchange for their agreement not to bid against Popejoy at a later letting. Popejoy also testified that he was influenced to give others complimentary bids when they had given him a complimentary bid in the past. (Tr. ___.)

Other witnesses testified that if they had given a "comp" bid to a contractor and had later asked that contractor for a "comp" bid on another project and had been told he would not give them a "comp" bid because he did not participate in that type of illegal activity, they would not give future complimentary bids for that contractor.

The evidence established the common purpose of giving complimentary bids was not only to make a greater profit, but to create outstanding obligations that could be collected on future projects. (*See,* Tr. Popejoy, Callaghan, Spray, Shears.) Orville Spray, Jr., President of Venture Corporation, testified he did not always get "tangible" benefits in return for submitting a "comp" bid. He testified he received more of an intangible benefit in that it created an expectation that he was owed a benefit at a future time.

The evidence further showed that each contractor had a certain area or territory within which he had an economic advantage. Because of this economic advantage, it was often futile for a competitor to bid in or around that area. Realizing the futility of their efforts to be awarded the project in a certain area, competitors often did not bid in another's area. Witnesses also testified that the social activities of the industry were such that the scheme of bid rigging was easily accessible. Popejoy also testified

that it was easy for new contractors to enter into the bid-rigging conspiracy. (Tr. ___.)

Guided by the "common objectives" test outlined in *Wilshire, supra,* it becomes obvious that the conspiracies charged in Beachner I and Beachner II in regard to defendant Beachner Construction Co., Inc. are merely separate parts of a larger, grand conspiracy that has been continuing for several years and for which defendant Beachner Construction Co., Inc. has already been tried and acquitted.

Applying the "common objectives" test utilized in the Tenth Circuit Court of Appeals, the evidence shows the existence of a common design or common objective, which is the essence of a conspiracy. Contractors in the industry steadily pursued the same objective of eliminating competition among themselves for nearly a quarter century. Although there were slight variances in the means by which the objective was sought, the same unlawful result was always the major goal. For example, in the 1960s and early 1970s, before the exit of San Ore Construction Co., the collusive bidding was conducted in a more organized manner. Most of the rigged bids were arranged at an annual meeting in January, whereby a list of probable jobs was produced by Claire Miller, President of San Ore, and then divided among the contractors. After San Ore exited the industry, however, the means of obtaining the objective of eliminating price competition, although still a way of life in the industry, was conducted in a less formally-organized manner. Arrangements were more on a letting-by-letting basis. Although the business of the conspiracy was conducted in a less formal manner, the fact remains the same objective of eliminating price competition existed, even though participants changed and some jobs were bid competitively during that time.

The "grandfather" case demonstrating defendants' theory in this case is *United States v. H.E. Koontz Creamery, Inc.,* 257 F.Supp. 295 (D.Md.1966). It is the oldest case in which a court dismissed a § 1 Sherman Act prosecution on double jeopardy grounds. In *Koontz,* the defendants were competitors in the Baltimore area milk business who entered into one, overall agreement to eliminate competition in milk prices in the Baltimore area. *Id.* at 310. The first indictment and subsequent trial was based on allegations that defendants had conspired to allocate Baltimore city school milk contracts from 1946 to 1957, and defendants had conspired to allocate Baltimore city and county school milk contracts in 1959 through 1960. Defendants pled guilty to this indictment. A second indictment, alleging a conspiracy to fix prices on milk sales to the regular wholesale and retail trade in the Baltimore area from 1956 to 1960 was dismissed on double jeopardy grounds.

The *Koontz* court found that, although there had been price competition at times during those years, different participants in the conspiracy and different time periods involved, the fact that a common purpose or objective of maintaining market price stability was shared by the moving defendants during all the times in question clearly signified a single, overall conspiracy. It is the common objective which is the key factor to be weighed in determining whether one or multiple conspiracies exist.

In the case at bar, the common objective of eliminating price competition among Kansas highway contractors is clear. Here, as in *Koontz,* there have been periods when jobs were competitively bid (*i.e.,* when work was scarce) and different participants have been involved at different time periods. The fact remains, however, the purpose to fix prices never changed.

The line of *Honda* cases, beginning with *United States v. American Honda Motor Co.,* 271 F.Supp. 979 (N.D.Cal.1967), followed the same analysis as *Koontz.* In the California case, Honda was indicted for conspiracy to fix retail prices of Honda motorcycles in the San Francisco Bay area. Having already been convicted for the same offense in the Los Angeles area, and being under indictment in Ohio and Illinois, Honda moved to dismiss on double jeopardy grounds.

As in *Koontz,* the government argued "multiple conspiracies," alleging a separate conspiracy existed in each area due to the different participants, geographical areas and various dates of commencement. Again, however, the court focused on the key factor of whether a common objective or purpose had been steadily pursued. Concluding the common objective existed to fix, maintain and stabilize retail prices of defendant's product in each area, the court granted defendant's motion to dismiss, stating: "... *American Honda,* having once been prosecuted, convicted and penalized for its conspiratorial activity, cannot be again so prosecuted, convicted or penalized and that on the record here such would be contrary to the double jeopardy provision of the Fifth Amendment." *Id.* at 986.

The *Honda* case in Illinois was likewise dismissed on grounds of double jeopardy [*see United States v. American Honda Co.,* 273 F.Supp. 810 (N.D.Ill.1967)] and the Ohio case was dismissed on grounds of *res judicata* [*see United States v. American Honda Motor Co.,* 289 F.Supp. 277 (S.D.Ohio 1968)].

A more recent case with circumstances most clearly on point with those in the case at bar is *United States v. Consolidated Packaging Corp.,* 575 F.2d 117 (7th Cir. 1978). In *Consolidated,* the government charged twenty-three folding carton companies in a single one-count § 1 indictment alleging a nation-wide price-fixing conspiracy in the industry. Of the twenty-three companies charged, Consolidated was the only company to go to trial, as all others pled *nolo contendere.* Consolidated was convicted. As in the highway construction business, the folding carton companies sold their products by competitively bidding on an order-by-order basis. A supplier wanting to raise his prices to a particular customer without fear of losing the customer to a competitor would exchange price information in advance with other suppliers who would agree to bid above that supplier's price, thereby assuring the supplier of an increased price and retention of the customer.

Finding a single broad-based conspiracy in the folding carton industry, the court stated:

"... Suppliers in the conspiracy were expected to accommodate each other.... It does not appear that a conspirator needed to approach each new bid-letting occasion in search of some dishonest accommodation with the great care or caution which might reasonably be anticipated in an isolated instance of soliciting illegal cooperation with a competitor. The rules of the nefarious economic game appear to have been recognized and accepted. There were benefits and at times burdens.... This illegitimate business practice appears to have flourished among so many of the conspirators for so long that it could reasonably be considered the customary way of doing business. All the facts and circumstances fully justify the view that a custom-made conspiratorial understanding had been developed and fashioned in a size and style most suited to their particular needs. Whenever the needs of any conspirator might require it, the conspirator had only to plug into the system, get 'on the phone,' and make the necessary arrangements. This system which developed and remained viable among them to be available for use by any conspirator was a pervasive aspect of the conspiracy. The many minor individual or particular conspiracies which the system fostered and spawned were evidence of the effectiveness of the general conspiracy. The conspiracy was in the nature of an industry utility, operated totally for the benefit of its shareholders, the carton producing conspirators, and to the detriment of its customers and the public...." *Id.* at 121.

Speaking in reference to a particular episode in which Consolidated participated in a particular price discussion, the court stated:

"... Regardless of how the bidding went or whether the agreement was kept or not, this episode from and after the time of the agreement was a conspiracy by itself, but beyond that, the circum-

stances suggest that this minor conspiracy was made possible by, and became a manifestation of, the larger overall conspiracy. The transcript reveals the ease with which this illegal agreement was entered into. A phone call was made and the meeting was held and agreement reached to honor the increased bidding.... No one appears to have hesitated, questioned or approached the meeting with any display of the caution that might be expected when first entering into such an illegal enterprise with competitors. It becomes apparent that the custom of the trade, the overall conspiracy, was well-known by 1970 and available for use whenever and to the extent it might help fulfill the needs of any subgroup of conspirators." *Id.* at 122.

Continuing, that court stated:

"In the evidence a pattern can be discerned in the similar activities of the conspirators. The intent of all to make more profit by price manipulation than could be anticipated from legitimate bidding exudes from the evidence. That could be accomplished by simply cooperating together in the industry to manipulate the prices.... If the conspirators could make the conspiracy work and minimize price competition, all conspirators could expect a more profitable survival due to the artificially established higher prices...." *Id.* at 128.

The court finds the circumstances of *Consolidated Packaging Corp.* are indistinguishable from those involved in the case at bar. In both cases, the industries had developed their own helpful jargon. In *Beachner,* such jargon consisted of the terms "set up job," "comp" or "complimentary" bid, or "go along," to name a few. In *Consolidated,* common jargon included the phrases "on the phone," or "off the phone," among others. In neither case did conspirators evidence any fear or apprehension in approaching competitors to solicit their illegal cooperation. Both cases demonstrate that although at times there were periods of competitive bidding, whenever the needs of

any conspirator might require a "set up" job, the conspiracy was available for use. Both cases demonstrate the tacit mutual understanding among competitors in the respective industries of a single overall conspiracy available for their use whenever and to the extent it might be helpful to fulfill their needs.

■ It is well settled that "[n]o formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose." *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Clearly a tacit understanding created and executed by a long course of conduct is enough to constitute agreement, even without personal communication. *Direct Sales Co. v. United States,* 319 U.S. 703, 714, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943). *United States v. Robinson,* 470 F.2d 121, 123 (7th Cir.1972); *United States v. Consolidated Packaging Corp., supra.* The court finds the requisite tacit agreement existed among highway contractors in the state of Kansas so as to create a single overall conspiracy.

Another case discussing the issue of single versus multiple conspiracies is *United States v. David E. Thompson, Inc.,* 621 F.2d 1147 (1st Cir.1980). Thompson was indicted and tried for participating in a single, wide-range construction industry conspiracy running from 1962 to 1977. Here, however, the defendant urged a theory of multiple conspiracies.

In rejecting defendant's theory, the court found a single conspiracy and emphasized the existence of a common objective:

"... The fact is, however, that the clearly foreseeable, and thus intended, effect of the conspiracy was to circumvent competitive bidding and obtain contracts at amounts well in excess of the amounts which would have prevailed had the conspiracy not existed." *Id.* at 1151, n. 5.

The court also based its finding of a single conspiracy on "... unchanging jargon, the implied reciprocity, and the facility with which each additional series of bids

were rigged with a minimum of planning and communication ..." *Id.* at 1152.

The court also discussed the effect of changing personnel on a single conspiracy. "A finding of a single conspiracy is not defeated merely because of personnel changes." *Id.* at 1152, quoting *United States v. Ochoa,* 609 F.2d 198 at 201 (5th Cir.1980).

The court in *United States v. Rodgers,* 624 F.2d 1303 (5th Cir.1980), *cert. denied* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), also found a single, long-term conspiracy. Rodgers was indicted and found guilty of an alleged bid-rigging scheme carried out by the river construction industry of the Mississippi River and its major tributaries between 1964 and 1978.

In finding a single conspiracy, the court focused on the "common goal" of the scheme, the common jargon (*i.e.,* prices had "to clear" or be "protected"), the similar methods of operation in each instance and the overlap in personnel. *Id.* at 1307.

The court must note it is aware of *United States v. Ashland-Warren, Inc.,* 537 F.Supp. 433 (M.D.Tenn.1982), wherein a contrary result was reached. Such result being held via *dictum,* this court does not find it persuasive.

The body of precedent comprised of *Koontz, Honda, Consolidated, Thompson* and *Rodgers,* the majority of which involve bid-rigging conspiracies, convince this court that there is but one ruling that can be made in the instant case. Defendant's motion to dismiss on double jeopardy grounds must be granted.

Having found sufficient evidence to dismiss defendant Beachner Construction Co., Inc. on double jeopardy grounds, and recognizing a corporation is entitled to assert the rights of this defense, the court finds it unnecessary to discuss the merits of this defendant's other proffered grounds for dismissal. In granting defendant Beachner Construction Co., Inc.'s motion to dismiss on grounds of double jeopardy, the court is in no way passing on the guilt or innocence of the corporation, but is determining only the issue which has been presented to the court for decision. The court also wishes to note that these activities which have clearly signified black days in the annals of the state of Kansas were not participated in by all highway asphalt contractors in the state of Kansas.

IT IS BY THE COURT THEREFORE ORDERED that defendant Beachner Construction Co., Inc.'s motion to dismiss on the basis of double jeopardy is hereby granted. Having so granted defendant's motion for dismissal, IT IS FURTHER ORDERED that defendant's motion for election of counts is hereby denied.

IT IS FURTHER ORDERED that the government's motion to sever is hereby granted.